UNITED STATES of America,
Plaintiff–Appellee,

v.

Jerald Wayne DICKERSON,
Claimant–Appellant,

v.

ONE CESSNA 421 B,
AIRCRAFT, Defendant.

No. 87–6003.

United States Court of Appeals,
Ninth Circuit.

Submitted Jan. 7, 1988 *.

Decided June 14, 1988.

Second Amended Opinion April 26, 1989.

Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Victor Sherman, Santa Monica, Cal., for claimant-appellant.

James R. Sullivan, Asst. U.S. Atty., Civil Div., Los Angeles, Cal., for plaintiff-appellee.

Before PREGERSON, CANBY and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

Jerald Wayne Dickerson appeals the forfeiture of his Cessna airplane. The plane was seized by U.S. Customs agents pursuant to federal forfeiture statutes. 19 U.S.C. § 1703; 21 U.S.C. § 881(a)(4). The district court held that Dickerson's plane was subject to forfeiture under either statute. Under section 881(a)(4), the government must first demonstrate that there was probable cause to believe the conveyance seized was used or intended to be used in narcotics transport. We conclude that the government failed to demonstrate probable cause because it did not sufficiently demonstrate that it secured Dickerson's airplane between the time it was seized and when it was searched. We also conclude that the airplane is not subject to forfeiture under section 1703. We REVERSE.

### FACTS

On February 27, 1986, at about 6:30 a.m., U.S. Customs and Marine Corps radar operators picked up a target aircraft in Mexico heading north toward the United States. The plane crossed into the United States near Mexicali. The plane did not stop in Calexico, California, the required Airport of Entry, for transition into the United States in that area. The plane proceeded to the Hemet–Ryan Airport where it landed about 7:18 a.m. A trailing customs aircraft identified the plane as a Cessna 421 and was able to make out the FAA tail registration number (N211PH). The plane left Hemet–Ryan three minutes later, without its pilot contacting anyone. A second Customs airplane was dispatched to intercept the suspect plane. At about 8:00 a.m. the Customs planes detected the target making numerous turns and course changes in the Banning Pass area. At about 8:30 a.m., the target turned north and proceeded over the San Bernardino mountains toward Apple Valley, California. The plane circled Apple Valley Airport and appeared to be

entering the Airport's traffic pattern for landing when it made an abrupt 180 turn and proceeded back into Banning Pass. For the next 30 to 45 minutes, the plane circled and turned in the Banning Pass area, flying close to the contours of the mountains. The target then left Banning Pass and flew east. It circled the Thermal Airport and on its second pass lowered its gear to land. On its final approach, while over the end of the runway, it retracted its landing gear and headed south over the Salton Sea. The plane crossed back into Mexico at approximately 9:57 a.m.

Radar followed the plane to the Punta Penasco airstrip in Mexico where it landed. Customs aircraft maintained a border patrol and at 11:40 a.m. the plane again appeared on radar scopes heading north to the United States. The aircraft entered the United States at about 12:00 p.m. Again, the plane did not legally enter or declare, as required, at Calexico, California. Customs aircraft briefly intercepted the plane, but lost it as it rapidly descended to less than 100 feet above ground level. The airplane landed at Holtville Airport and remained on the ground for about 15 minutes. When the plane departed Holtville, a Customs aircraft again spotted the target and pursued it to Desert Air Sky Ranch. The plane landed and was blocked by a closely following Customs aircraft. Its registration number was N211PH. Dickerson, the pilot of the plane, was arrested and the plane was searched. No narcotics nor debris of narcotics were found. Inspection of the aircraft showed that its rear seats had been removed. A carpet was found rolled up in the back of the cargo space. The cargo space behind the front seats was 12 feet long, four feet wide, and five feet high. The plane was equipped with some advanced equipment, including: state-of-the-art programmable ground to air radios and a ham radio with an "omnidirectional" antenna. Also, the plane had been fitted with an "after-market" nose fuel tank and additional fuel tanks in the wings. The fuel tanks increased the Cessna's flying time by some two and one half hours—about a 50 percent gain. The Cessna's tanks were nearly exhausted. Fuel was transferred to the plane and it was flown by Customs agents to the Thermal Airport and then to the Customs air facility at North Island Naval Air Station. On March 4, 1986, some six days after the plane was seized, the plane was inventoried and searched. "Brutus", a narcotics detection dog, was brought to the plane. The dog alerted to a section of the carpet that was now found to be unrolled in the cargo area. The dog alerted to a two foot wide square of the carpet. However, no debris of any drug was found in the carpet or on the floor of the plane.

At trial, a Customs agent testified that the airplane's erratic flying pattern was not normal and that planes did not normally fly at such low altitudes. The agent also testified that he had followed other aircraft exhibiting similar "evasive" maneuvers and agents had found drugs on these planes 80 to 90 per cent of the time. The agent also testified that a Cessna 421 is particularly suitable for narcotics smuggling because of its large cargo area. In addition, this particular plane, due to its extended range, was even a better vehicle for narcotics transport. It was the agent's opinion that the airplane flew as it did in order to avoid detection. He also stated the aircraft was equipped in a typical manner used by narcotics smugglers.

The agent admitted, however, that many of these same facts were consistent with an innocent as well as an illegal purpose. The programmable radios were tuned to standard flight service and weather information frequencies and not to frequencies of significance to smuggling activities. He also admitted that the alterations to the aircraft were done with FAA approval while smugglers normally alter their planes in a clandestine and illegal way. Also, the plane was registered to Dickerson or to a company owned by Dickerson. The agent admitted that smugglers normally register their planes to fictitious entities or people. Also, he stated that smugglers normally bring with them an off-loading crew while this plane had none. He also admitted that he never saw this plane unload any contraband. He also noted that most smuggling operations take place at night while this flight took place during daylight hours—the period of maximum visibility.

Brutus' handler also testified at trial. He stated that, based on his dog's alert, in his opinion a large quantity—up to 50 pounds—of marijuana had been in the plane in the prior two weeks. He also testified that he did not believe that any drugs were actually then present in the plane. He did not know who had been in the plane during the six-day period between the initial seizure and the dog search. He argued that as far as he knew, anyone who had the scent of marijuana on them could have been in the plane during that period, thus causing Brutus to alert. He also testified that the carpet was not rolled up in the back of the plane but had been laid flat.

## DISCUSSION

■ 21 U.S.C. § 881(a)(4) provides for the forfeiture of "[a]ll conveyances, including aircraft ... which are used, or are intended for use, to transport [controlled substances]...." In such a forfeiture proceeding, the government must first demonstrate that there is probable cause to believe that the plane was used or intended to be used in transporting narcotics.

■ In forfeiture proceedings, the district court's probable cause determination is reviewed de novo. *United States v. $93,685.61 In U.S. Currency*, 730 F.2d 571, 572 (9th Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 61 (1984). The standard of probable cause to support a seizure for forfeiture is similar to that required to obtain a search warrant. To meet its burden, the government must show that it had "reasonable grounds" to believe that the plane was used to transport drugs. *United States v. One 56-Foot Motor Yacht Named Tahuna*, 702 F.2d 1276, 1281–82 (9th Cir.1983). The government's belief must be based on more than mere suspicion. *United States v. $5,644,540.00 In U.S. Currency*, 799 F.2d 1357, 1362 (9th Cir.1986); *Tahuna*, 702 F.2d at 1282.

■ The facts known to the government at the time of the seizure give rise to a suspicion that the plane had been used in drug-related activity. The erratic flying pattern of the aircraft, its abrupt return to Mexico, the aborted landings and quick departures from various airports without contacting anyone on the ground, its failure to land at the designated area entry airport, and perhaps the alterations to the plane's cargo area and fuel systems all point to a less than innocent activity. However, these facts give rise to no more than a mere suspicion that the plane was involved in narcotics transport. The Customs Agents' belief, based on these facts, was nothing more than an "inchoate and unparticularized suspicion or 'hunch.'" *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam) (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968)). However, what certainly would provide probable cause to believe that the plane was involved in drug traffic was the alert of "Brutus" the drug dog. We find, however, for reasons explained below, that the probative value of the alert must be rejected.

To pass the point of mere suspicion and to reach probable cause, it is necessary to demonstrate by some *credible evidence* the probability that the plane was in fact used to transport a controlled substance. *Tahuna*, 702 F.2d at 1282. The information relied on by the government must be sufficiently reliable to support the probable cause finding. *Id.* The evidence provided by the alert showed that at some time prior to the alert a narcotics substance was on the rug. Brutus' alert, however, took place almost a week after the initial seizure of the airplane. Both customs agents that testified at trial admitted that they did not know who had been in the plane during the six-day period. The dog handler also testified that anyone with the smell of drugs on them could have been in the plane during this period causing the dog to alert. No debris or other evidence of drugs was found anywhere in the plane. There was also evidence of tampering with the contents of the plane. When initially seized, the cargo space's carpet was rolled or bunched up in the back of the plane. When the Customs agent arrived with Brutus six days later to search the plane, the carpet had been laid flat on the floor of the airplane.

The government had the burden of establishing that the plane was secured during the six days that it was in its custody. Tangible evidence of crime is admissible only when shown to be in substantially the same condition as when the crime was committed. *Gallego v. United States,* 276 F.2d 914, 917 (9th Cir.1960); *see also United States v. Godoy,* 528 F.2d 281, 283 (9th Cir.1975) (per curiam). An important factor to be considered is the likelihood of intermeddlers tampering with the evidence. *Gallego,* 276 F.2d at 917. If there is some evidence of tampering, then the government must show that acceptable precautions were taken to maintain the evidence in its original state. *United States v. Anderson,* 654 F.2d 1264, 1267 (8th Cir. 1981), *cert. denied,* 454 U.S. 1127, 102 S.Ct. 978, 71 L.Ed.2d 115 (1981); *United States v. Lane,* 591 F.2d 961, 962 (D.C.Cir.1979) (citing *Gallego* ). Here, there was evidence of tampering. The carpet which Brutus alerted to had been moved from its original place in the plane. Neither Customs agent could testify whether and how the plane had been secured during the six-day period the government had the plane in custody. The government could not establish that "acceptable precautions," or any precautions at all, were taken to maintain the plane or its contents in their original state. One is left with the possibility that narcotics were introduced *after* the plane was seized or might have been introduced *before* the plane was seized. Either possibility is as credible as the other. The government did not have "reasonable grounds" to believe the plane was used to transport drugs. On this state of the record, probable cause to forfeit Dickerson's plane pursuant to 21 U.S.C. § 881(a)(4) has not been established.

We also do not find that Dickerson's plane was subject to forfeiture under 19 U.S.C. § 1703. Although the Sixth Circuit has applied section 1703 to aircraft, *United States v. One (1) 1966 Beechcraft Baron, No. N242BS,* 788 F.2d 384 (6th Cir.1986), this circuit has not decided the issue. Assuming, without deciding, that section 1703 applies to aircraft, none of the requirements for forfeiture are met in this case. There is no evidence that Dickerson failed to display his lights or failed to comply with an order or direction of a customs official to stop his airplane. *See* 19 U.S.C. § 1703(c). Furthermore, the government failed to establish probable cause to believe that Dickerson's airplane was fitted out for smuggling. *See id.* § 1703(a). Although the airplane had been altered, it was done with FAA approval. These facts give rise to no more than a mere suspicion that the airplane was fitted out for smuggling. As discussed above, the government did not have "reasonable grounds" to believe that the plane was involved in smuggling activities. Thus, probable cause to believe the plane was fitted out for smuggling has not been established. On this record, probable cause to forfeit Dickerson's plane pursuant to 19 U.S.C. § 1703 has not been established.

## CONCLUSION

We REVERSE the district court's decision forfeiting Dickerson's airplane.