UNITED STATES of America,
Plaintiff–Appellant,

v.

U.S. CURRENCY, $30,060.00, Defendant.

Albert Joseph Alexander,
Claimant–Appellee.

No. 92–55919.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 31, 1994.

Decided Nov. 8, 1994.

Lee S. Arian, Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellant.

Jerold L. Bloom, Sherman Oaks, CA, for claimant-appellee.

Before: TANG, PREGERSON, and NOONAN, Circuit Judges.

Opinion by Judge TANG; Dissent by Judge NOONAN.

TANG, Senior Circuit Judge:

The government appeals the district court's grant of summary judgment in favor of Albert Joseph Alexander. The district court concluded the government did not establish probable cause that $30,060 seized from Alexander was connected to drugs as required to warrant forfeiture under 21 U.S.C. § 881(a)(6). The government argues the narcotics detection dog's positive alert to the presence of the scent of a controlled substance on Alexander's money, the packaging and the amount of the money, and Alexander's false accounts of the money's source and his own employment record is sufficient evidence to establish the requisite probable cause. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

## BACKGROUND

Deputies of the Los Angeles County Sheriff's Department stopped Alexander for running a stop sign. When the deputies approached Alexander's Ford Tempo, they saw on the front passenger seat a plastic bag filled with money. The money was arranged in $1,000 stacks bound by rubber bands; the bills included denominations of $5, $10, $20, $50, and $100. It is unclear whether the deputies removed the plastic bag from the seat. While still at the scene, they called for a narcotics detection dog. The dog positively alerted to the bag of money, indicating the presence of the scent of a controlled substance. The deputies searched Alexander and his car for drugs, but found none.

After reading Alexander his rights, the deputies questioned him about the money. Alexander stated: (1) the bag contained $30,000; (2) he was a partner with Dave Tucker and had earned the money by working at Tucker's Cafe; (3) he had no documentation to show how he had earned the money nor a bank account where he kept the money; and (4) he currently worked at a store named Jim Dandy's Liquor. Thereafter, Alexander was taken into custody and charged with violating Cal. Health and Safety Code § 11352, an offense involving a controlled substance.

Back at the station, the deputies attempted to verify Alexander's statements. The money was counted and it totaled $30,060. The deputies called Dave Tucker at a number provided by Alexander. Tucker said that Alexander was his daughter's boyfriend and had no connection to Tucker's Cafe. They also called Steve Lee of Jim Dandy's Liquor who stated that Alexander no longer worked at the liquor store.

All state charges against Alexander were eventually dismissed. The Federal Bureau of Investigation adopted the seizure, however, and the federal government sought to forfeit Alexander's money as drug money under 21 U.S.C. § 881(a)(6). Alexander responded that the seizure was illegal and moved to dismiss the government's complaint and to suppress evidence derived from the

search of his car. The district court denied Alexander's motion. Alexander sought a writ of mandamus from the Ninth Circuit, but the writ was denied.

Alexander next moved for summary judgment. After briefing and oral argument on the motion, the district court granted summary judgment in favor of Alexander, concluding the above facts were insufficient to establish probable cause that the money was connected to drugs as required to warrant forfeiture under 21 U.S.C. § 881(a)(6). The government filed a timely notice of appeal, and the district court stayed execution of the judgment pending the government's appeal.

### STANDARD OF REVIEW

■ A district court's determination of probable cause is reviewed *de novo* as a question of law. *United States v. One 1985 Cadillac Seville*, 866 F.2d 1142, 1146 (9th Cir.1989). A district court's grant of summary judgment is also reviewed *de novo. Tzung v. State Farm Fire and Casualty Co.*, 873 F.2d 1338, 1339 (9th Cir.1989). The evidence must be viewed in the light most favorable to the non-moving party to determine whether there are any genuine issues of material fact for trial and whether the district court correctly applied the relevant substantive law. *Id.* at 1339–40.

### DISCUSSION

■ In a civil forfeiture proceeding under 21 U.S.C. § 881(a)(6), seized money is subject to forfeiture if it was: "(1) furnished or intended to be furnished in exchange for a controlled substance; (2) traceable to such an exchange; or (3) used or intended to be used to facilitate a violation of federal drug laws." *United States v. $191,910 in U.S. Currency*, 16 F.3d 1051, 1071 (9th Cir.1994). In such a proceeding, the government must initially establish probable cause that the claimant's money was connected to drugs. 21 U.S.C. § 881(d); 19 U.S.C. § 1615; *United States v. $5,644,540.00 in U.S. Currency*, 799 F.2d 1357, 1362 (9th Cir.1986). The determination of probable cause is based on "the aggregate of facts," *United States v. $93,685.61 in U.S. Currency*, 730 F.2d 571, 572 (9th Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 119, 83

L.Ed.2d 61 (1984), and "simply involves the question whether the information relied on by the government is adequate and sufficiently reliable to warrant the belief by a reasonable person that the [money] was" connected to drugs. *United States v. One 56–Foot Yacht Named Tahuna*, 702 F.2d 1276, 1282 (9th Cir.1983). Circumstantial evidence may suffice to establish probable cause for forfeiture. *United States v. 1982 Yukon Delta Houseboat*, 774 F.2d 1432 (9th Cir.1985).

To meet its burden of establishing probable cause, "the government must show that it had reasonable grounds to believe that the [money] was related to an illegal drug transaction, supported by less than prima facie proof but more than mere suspicion." *$5,644,540.00 in U.S. Currency*, 799 F.2d at 1362. "To pass the point of mere suspicion and to reach probable cause, it is necessary to demonstrate by some *credible evidence* the probability that the money was in fact connected to drugs." *United States v. Dickerson*, 873 F.2d 1181, 1184 (9th Cir.1988) (emphasis in original).

■ The government argues the narcotics detection dog's positive alert to the presence of the scent of a controlled substance on Alexander's money, the packaging and amount of the money, and Alexander's false accounts of the money's source and his own employment record is sufficient evidence to establish probable cause that Alexander's money is connected to drugs as required to warrant forfeiture under 21 U.S.C. § 881(a)(6). The district court found it was not, and, under the circumstances of this case, we agree. These facts, alone or in combination with each other, are insufficient to establish the requisite probable cause.

The government emphasizes the narcotics detection dog's positive alert to Alexander's large sum of money and the plastic bag in which that money was contained. We have previously found such an alert to be "strong evidence" when making a probable cause determination. *United States v. $215,300 U.S. Currency*, 882 F.2d 417, 419 (9th Cir.1989), *cert. denied*, 497 U.S. 1005 (1990). In recent years, however, subsequent courts, including

our own, have questioned the probative value of positive dog alerts due to the contamination of America's paper money supply with narcotics residue. *See $191,910 in U.S. Currency,* 16 F.3d 1051, 1062 n. 21 (9th Cir.1994) (expressing concern that currency contamination may affect the probative value of a narcotics detection dog's positive alert in currency forfeiture cases); *United States v. $53,082 in U.S. Currency,* 985 F.2d 245, 250 n. 5 (6th Cir.1993) (same); *United States v. $639,558 in U.S. Currency,* 955 F.2d 712, 714 n. 2 (D.C.Cir.1992) (same); *see also Jones v. Drug Enforcement Admin.,* 819 F.Supp. 698, 719–21 (M.D.Tenn.1993) (rejecting the probative value of a narcotics detection dog's positive alert to seized currency on the basis of evidence of widespread currency contamination); *United States v. $80,760 in U.S. Currency,* 781 F.Supp. 462, 475–76 (N.D.Texas 1991), *aff'd,* 978 F.2d 709 (5th Cir.1992) (table) (same).

■ In addition, this court has never held that the mere fact of a narcotics dog's positive alert to a large sum of money constitutes sufficient evidence to establish probable cause for forfeiture. Rather, probable cause is established only when an "aggregate" of facts—over and beyond the positive dog alert to a large sum of money—demonstrate the money's connection to drugs, with no single fact being dispositive. *See $215,300 U.S. Currency,* 882 F.2d at 419; *United States v. $5,644,540 in U.S. Currency,* 799 F.2d at 1363 (finding that no single fact was dispositive with regard to a probable cause determination). We decline to expand the holding of *$215,300 U.S. Currency* to encompass the instant case, where the aggregate of facts do not demonstrate the money's connection to drugs, and where Alexander has documented through uncontradicted evidence that greater than seventy-five percent of all circulated currency in Los Angeles is contaminated with the residue of cocaine or other controlled substances.

Alexander's evidence was presented by affidavit from Jay B. Williams, a forensic toxicologist who has specialized in drug and alcohol analysis for over twenty-four years. Since 1982, Williams has conducted numerous tests concerning the contamination of

circulated United States currency. He has tested samples of $1, $2, $5, $10, $20, $50 and $100 bills taken from noncriminal sources, such as banks, casinos, department stores and restaurants, in various cities throughout the western United States. According to Williams's tests, the percentage of contaminated currency ranges from approximately ten to fifteen percent in Bozeman, Montana to seventy-five percent in Los Angeles and Las Vegas. The bills tested contained from nanogram (billionths of a gram) to milligram (thousandths of a gram) quantities of cocaine.

Currency contamination results from a combination of the practice of drug dealers using large sums of cash in drug transactions and the adhesiveness of certain drugs such as cocaine. *See* Judith Dennison Wolferts, Note, *In re One Hundred Two Thousand Dollars: Cash Friendly Civil Forfeiture,* 1993 Utah L.Rev. 971, 979–80 (citing Vincent Cordova, director of criminalistics for National Medical Services in Willow Grove, Pennsylvania, *quoted in* Andrew Schneider & Mary P. Flaherty, *Drugs Contaminate Nearly All the Money in America,* Pitt. Press, Aug. 12, 1991, at A6). "Cocaine can be easily transferred simply by shaking hands with someone who has handled the drug: a pharmacist, toxicologist, police officer, or drug trafficker" *Id.* at 979. In fact, "a single bill used to snort cocaine or mingled with the drug during a transaction can contaminate an entire cash drawer." Debbie M. Price, *Use of Drug–Sniffing Dogs Challenged: ACLU Backs Complaint by Men Whose Pocket Cash is Seized,* Wash. Post, May 6, 1990, at D1, D6 (citing study of Lee Hearn, chief toxicologist for the Dade County, Florida Medical Examiner's Office). Those bills go on to contaminate others as they pass through cash registers, wallets, and counting machines *$639,558.00,* 955 F.2d at 714 n. 2 (citing *Crime and Chemical Analysis,* 243 Science 1554, 1555 (1989)); David B. Smith, *Prosecution and Defense of Forfeiture Cases,* ¶ 4.03 at 4–79 (1993). Given that an estimated one out of three circulating bills has been used in a drug transaction, currency contamination comes as no surprise. *$639,558 in U.S. Currency,* 955 F.2d at 714 n. 2 (citing R. Siegel, Intoxication 293 (1989)); *see also* Jeff Brazil & Steve Barry, *You May be Drug*

*Free, But is Your Money? Cocaine is Found on the Cash of 8 Non-users. The Test Suggests That a Drug Dog Would Detect Cocaine on Almost Anyone's Money,* Orlando Sentinel, June 15, 1992, at A6 (noting that of eight samples of cash taken from a police chief, a circuit judge, a state senator, a mayor, a community college president, the Orlando Sentinel editor, a reverend, and a county chairman, six out of the eight samples showed detectable amounts of cocaine that were "well within the range of a drug dog's detection ability").

Alexander's evidence that greater than seventy-five percent of circulated currency in Los Angeles is contaminated with drug residue is consistent with the results of other studies of currency contamination. *See $53,-082 in U.S. Currency,* 985 F.2d at 250 n. 5 (citing study by Lee Hearn, chief toxicologist for the Dade County, Florida Medical Examiner's Office, finding that ninety-seven percent of bills taken from various cities throughout the United States tested positive for cocaine); *$639,558 in U.S. Currency,* 955 F.2d at 714 n. 2 (referring to testimony of Dr. James Woodford that ninety percent of all cash in the United States contains sufficient quantities of cocaine to alert a narcotics detection dog); *$80,760 in U.S. Currency,* 781 F.Supp. at 475–76 (citing study by Dr. Jay Poupko and his colleagues at toxicology Consultants Inc. in Miami, Florida, finding that an average of ninety-six percent of the analyzed bills taken from various cities throughout the United States, including Los Angeles, tested positive for cocaine).

■ If greater than seventy-five percent of all circulated currency in Los Angeles is contaminated with drug residue, it is extremely likely a narcotics detection dog will positively alert when presented with a large sum of currency from that area. Given this high degree of certainty, the probative value of a positive dog alert in currency forfeiture cases in Los Angeles is significantly diminished and "the continued reliance of courts and law enforcement officers on [such an alert] to separate 'legitimate' currency from 'drug-connected' currency is logically indefensible." [1] *Jones,* 819 F.Supp. at 721.

Undoubtedly, a positive dog alert is probative in showing that the currency has been in contact with a narcotics substance or contaminated currency at some "prior" point in time. *Dickerson,* 873 F.2d at 1184. The mere fact of prior contamination does not establish, however, that the currency was actually exchanged for or intended to be exchanged for drugs by the person currently in possession of the currency—especially when seventy-five percent of Los Angeles' paper money supply is tainted with drug residue.

Indeed, we have upheld probable cause findings in cases involving a positive dog alert *only* when the dog alert was combined with other credible evidence clearly connecting the money to drugs. *See $215,300 U.S. Currency,* 882 F.2d at 419 (using an "aggregate" of the facts test which included not only a positive dog alert, but also additional evidence that the money was carried on a flight to a known drug-source city, the money was concealed and strapped to the suspect's body, and the travel agency which issued the suspect's ticket was known to have issued tickets to 20–30 other people from whom the police had previously seized narcotics-related currency); *Dickerson,* 873 F.2d at 1184 (noting that, in addition to a positive dog alert, it was "necessary to demonstrate by some *credible evidence*" that a plane seized by the government "was in fact used to transport a controlled substance"); *see also $80,760 in U.S. Currency,* 781 F.Supp. at 476 (questioning the probative value of a narcotics detection dog's positive alert in the absence of any other credible evidence connecting the money to drugs). Where there is only a dog alert but no other credible evidence connecting the money or property to drugs, we have not hesitated to reverse a finding of probable cause. *See Dickerson,* 873 F.2d at 1184–85

---

1. This is not to say, of course, that evidence of currency contamination may *never* be used as evidence to support a finding of probable cause. It may be of some probative value if the degree of contamination is significantly greater than is normal for a particular city or region. However, the government did not introduce any such evidence in this case—indeed, it could not because it deposited Alexander's money into a government account and lost the plastic bag in which that money was contained before either could be tested.

(finding that a narcotics detection dog's positive alert to a rug found in an airplane's cargo area was insufficient to establish probable cause because there was evidence of tampering and because there was a lack of credible evidence that the plane was in fact used to transport drugs).

In this case, there is no credible evidence connecting Alexander's money to drugs. The government contends that drug dealers carry their money in wrapped bundles and that $30,060 is consistent with the cost of two kilograms of cocaine. It provides, however, no authority for these contentions, which are, in any case, speculative. It seems perfectly reasonable that anyone who is in possession of a large sum of money, for whatever purpose, might separate that money into smaller and more easily manageable increments. Moreover, according to the government's own witness, $30,000—not $30,060—is consistent with the price of two kilograms of cocaine. Even allowing for this discrepancy, the government's argument compels absurd conclusions. For instance, under the government's rationale, anyone in possession of $15,000 or $15,030; $7,500 or $7,015; $3,000 or $3,006; $300 or $300.60 would be suspect because those figures happen to correspond to the price of 1 kilogram, half a kilogram, one hundred grams, and ten grams of cocaine. We decline to indulge in such speculation.

■ The government also points to circumstantial evidence regarding the large amount of Alexander's money and his false accounts of the money's source and his own employment record.[2] While this evidence may support a suspicion of illegal activity, a mere suspicion of illegal activity is not enough to establish probable cause that the money was connected to drugs. *$191,910 in U.S. Currency,* 16 F.3d at 1072. Alexander "could just as easily have been a distributor of 'street money' in a political campaign, an embezzler, a jewel smuggler, an art thief, or an S & L crook as a drug conspirator."

*$191,910 in U.S. Currency,* 16 F.3d at 1072. As this court recently explained, "suspicions of general criminality are not enough. To obtain forfeiture under § 881, the government must have *probable cause* to believe that the money is connected specifically to *drug* activities." *Id.* at 1072 (emphasis in original).

We have, of course, previously found a claimant's lies, lack of employment, or his possession of a large sum of money to be of some probative value in determining probable cause in a currency forfeiture proceeding. *See $215,300 U.S. Currency,* 882 F.2d at 419; *United States v. U.S. Currency, $83,310.78,* 851 F.2d 1231, 1235–36 (9th Cir.1988); *$5,644,540.00 in U.S. Currency,* 799 F.2d at 1363; *$93,685.61 in U.S. Currency,* 730 F.2d at 572. These facts, however, always have been considered in the "aggregate of facts" with other credible evidence connecting the money to drugs. We have never found that these facts—even when combined with a positive dog alert—were sufficient to establish the requisite probable cause in a forfeiture proceeding without the addition of other credible evidence linking the money to drugs.

For example, in *$215,300 U.S. Currency,* in addition to the facts that the claimant was carrying a large amount of cash and lying about its source, the "aggregate of facts" included not only a positive dog alert made by a reliable narcotics detection dog, but additional evidence that the money was carried on a flight to a known drug-source city, that the money was concealed and strapped to the claimant's body, and that the travel agency which issued the claimant's airline ticket was known to have issued tickets to 20–30 other people from whom the police had previously seized narcotics-related currency. 882 F.2d at 419. In *U.S. Currency $83,-310.78,* the suspect not only lied about the source of the large sum of money, but also locked himself in the bathroom and flushed the toilet when the police were outside the bathroom door, and had two prior drug-related convictions and one drug-related arrest.

**2.** We need not address the government's argument that it can establish probable cause through evidence obtained *after* the initial seizure—*i.e.* evidence of Alexander's unemployment—because, as explained below, even considering this evidence, the government fails to establish the requisite probable cause.

851 F.2d at 1235–36. In *$5,644,540.00 in U.S. Currency*, the "aggregate of facts" included not only a large sum of money, but also the suspect's connection with a Marin County motel known as a site for drug transactions and the presence of cocaine in one of the suitcases containing money. 799 F.2d at 1357. Similarly, in *$93,685.61 in U.S. Currency*, the "aggregate of facts" included not only a large sum of money, but also drug paraphernalia found in the same room as the money together with other evidence documenting the claimant's involvement in drugs since 1978. 730 F.2d at 572.

In this case, the government cannot show the "aggregate of facts" raises more than a mere suspicion that the money seized from Alexander was connected to drugs. Unlike in *$93,685.61 in U.S. Currency* and *$5,644,-540.00 in U.S. Currency*, no drugs or drug paraphernalia were found in the search of Alexander or his car. Unlike in *U.S. Currency $83,310.78*, where the claimant had two prior convictions and one arrest for drug-related transactions, Alexander's declaration that he has "never been arrested for, convicted of or in any way been involved in any illegal activity dealing with drugs or drug related matters" was uncontradicted by the government. Unlike in *$215,300 U.S. Currency*, Alexander was driving a car when he ran a stop sign, not flying to a known drug-source city; the money was in plain view, not concealed and strapped to his body; and he was alone, not involved with other people or a travel agency with a history of working with drug dealers.[3]

The government's failure to demonstrate by some credible evidence the probability that Alexander's money was in fact drug-related, coupled with the uncontroverted evidence that greater than seventy-five percent of all circulated currency in Los Angeles is contaminated with drug residue, distinguish this case from our previous currency forfeiture cases. We therefore hold that the narcotics detection dog's positive alert to Alex-

ander's money, the packaging and amount of Alexander's money, and his false accounts of the money's source and his own employment record is insufficient evidence to establish probable cause that the money was connected to drugs as required to warrant forfeiture under 21 U.S.C. § 881(a)(6). Accordingly, we find that the district court properly granted Alexander's motion for summary judgement.

AFFIRMED.

NOONAN, Circuit Judge, dissenting:

I would not depend on the dog but I would consider the facts as they converge in the context of Los Angeles. Albert Joseph Alexander is a young man 30 years old at the time he was stopped on an April evening in 1990 with $30,060 in cash on the front seat of his car. He at once told the police about where he had obtained the money, saying he had earned it as a partner of Dan Tucker at Tucker's Cafe. He also told the police about his current employment, saying that he worked at Jim Dandy's Liquor. As it turned out, he had not earned the money by working at Jim Dandy's. He had not been a partner of Tucker but was dating his daughter. Albert Joseph Alexander had not worked for five years. His sole legal source of support was his mother, an employee of the post office.

The money was in a plastic bag. The bills included denominations of $5, $10, $20, $50 and $100. They were bound by rubber bands and stacked so that each set amounted to $1,000. Although there was one uneven stack because the total was $30,060, Alexander believed that he had only $30,000 and so stated to the police.

It is proper to consider the convergence of the lie about the source of the money, the lie about Alexander's job, the arrangement of the cash into bundles of $1,000, the absence of any income acknowledged by Alexander, his strange and mistaken belief that he had a

---

**3.** We also note that Alexander's $30,060 is significantly less than $215,300. This court recently stated that in assessing probable cause in currency forfeiture cases, there is a difference between a "large amount of money" such as $215,300 and a sum of money "as small as … $15-

$20,000.00." *$191,910.00 in U.S. Currency*, 16 F.3d at 1072. The court noted that this circuit's previous currency forfeiture cases involved four to ten times more cash than $15–20,000. *Id.* Here, $215,300 is seven times more cash than Alexander's $30,060.

round sum of $30,000, his immature hope that his girlfriend's father would cover for him, the time of day and year, and the city where he was arrested. What else could Alexander be but the agent of a drug ring? His lies and his lack of income make it clear that the money was illegally obtained: the money's illegality is far more than a suspicion, it's a virtual certainty. Alexander could not "just as easily have been a distributor of 'street money' in a political campaign"; it was not the season. He could not have been an embezzler; he had no job where he could embezzle. He could not have been "an S & L crook"; he had no connection with any bank. Abstractly speaking, he could have been a jewel smuggler, an art thief, an extortioner, a bank robber, or a kidnapper. But the government was not obliged to prove him guilty of a particular crime beyond a reasonable doubt, only to prove what the probability was. It may well be doubted that any sophisticated or violent criminal would be so casual in the keeping of his cash.

We deal with probabilities in the real world, in a city where the drug trade has flourished and where seventy-five percent of the currency is tainted with drugs. Nine persons out of ten would come to the same conclusion as the police, the dog, and the government: the money was drug money, neatly packaged in a round sum, as Alexander believed, for delivery. The carrier was careless. He and his employers are given an unjustified break by indulging the fiction that there is substantial doubt about the crime the cash was connected with. The proper standard for forfeiture is a practical, common sense appraisal of whether, given the particular convergent circumstances, there is *"probable cause for belief* that a substantial connection exists between the property to be forfeited and the criminal activity [required by 21 U.S.C. § 881(a)(6) ]". *United States v. $5,644,540.00 in U.S. Currency,* 799 F.2d 1357, 1362–63 (9th Cir.1986) (emphasis in original). The standard has not been altered, as the majority seems to imply, by *United States v. $191,910 in U.S. Currency,* 16 F.3d 1051, 1072 (9th Cir.1994). There is probable cause to believe the cash here was specifically connected to criminal drug activity. No other plausible source exists. The process of eliminating plausible alternatives establishes the probability.

The majority opinion also fails to correct the error of the district court assessing probable cause at the time the seizure was effected rather than at the time of the forfeiture proceeding. *United States v. One 1985 Cadillac Seville,* 866 F.2d 1142, 1146–47 (9th Cir.1989); *United States v. 4492 S. Livonia Road,* 889 F.2d 1258, 1268 (2d Cir.1989).