(97 P.3d 1051)

Nos. 90,869
90,870
90,871

STATE OF KANSAS, *Appellant,* v. VALERIA ROMO-URIARIE, LEROY
J. MADER, and AARON J. FREDRICKSON, *Appellees.*

Opinion filed
March 19, 2004.

*Ernest H. Richardson,* county attorney, and *Phill Kline,* attorney general, for appellant.

*Linda L. Eckelman,* of Dodge City, for appellees Romo-Uriarie and Mader.

*David P. Leon,* of Wichita, for appellee Fredrickson.

Before GREEN, P.J., LEWIS, J., and JOHN J. BUKATY, JR., District Judge, assigned.

GREEN, J.: The State of Kansas appeals from a judgment of the trial court dismissing the charge of unlawful acts involving proceeds derived from violations of the Uniform Controlled Substances Act against the defendants Valeria Romo-Uriarie, Leroy J. Mader, and Aaron J. Fredrickson. The trial court determined that *State v. McGrew,* 29 Kan. App. 2d 1051, 36 P.3d 334 (2001), controlled. In *McGrew,* this court held that to be convicted of money laundering under K.S.A. 2000 Supp. 65-4142, "one other than defendant must first derive proceeds from a violation of the Act, then those proceeds must be received or acquired by defendant in another transaction." 29 Kan. App. 2d at 1054. Here, the trial court concluded that the State failed to show that this type of transaction had occurred and dismissed the charges. We determine that the rule established in *McGrew* is inapplicable to this case. As a result, we reverse and remand for reinstatement of the charges against the defendants.

Deputy William Maddux was in his patrol car on US-54 Highway, when he saw a car with Minnesota license plates traveling west on the highway. After observing the car travel over the right white line for approximately 100 to 150 feet, Maddux followed the car. He determined that the car was traveling 68 miles per hour in a 65 mile-per-hour speed zone. Maddux testified that when he got behind the car, it slowed to approximately 55 miles per hour. Maddux checked the Minnesota license tag, which came back clear. He stopped the car.

The car contained three occupants: Aaron J. Fredrickson, the driver; Leroy J. Mader, the front-seat passenger; and Valeria Romo-Uriarie, the back-seat passenger. Maddux asked Fredrickson to get his driver's license and proof of insurance, to leave the car, and to get into the patrol car.

After Maddux and Fredrickson got into the patrol car, Maddux reviewed the driver's license and proof of insurance. Maddux asked Fredrickson questions regarding his relationship to the other oc-

cupants of the car, their point of origin and destination, and the purpose for their trip. During the conversation, Fredrickson told Maddux that the other occupants were his parents, that they had been visiting his brother, and that they were traveling from Apple Valley, Minnesota, to Phoenix, Arizona. Fredrickson stated that he attended school in Phoenix, that his father rebuilt alternators, and that his mother did not work. When Maddux asked Fredrickson how his parents would return to Minnesota, Fredrickson stated that they would fly back. Maddux asked Fredrickson where his parents lived, and he said they lived in Phoenix. When Maddux inquired about the inconsistency, Fredrickson said that he had misunderstood the previous question.

Maddux left Fredrickson in the patrol car and went to talk with Mader and Romo-Uriarie. Mader and Romo-Uriarie told Maddux that they were not married to each other and Fredrickson was not their son. They stated that Fredrickson had been their friend since the summer of 2002. Romo-Uriarie stated that she had lived in Phoenix for 12 years, and Mader indicated that he had lived in Phoenix since the summer of 2002. Mader told Maddux they had gone to Minnesota to get a "semi" from Fredrickson's father to haul produce out of Arizona.

After talking with Mader and Romo-Uriarie, Maddux suspected that criminal activity had been, was being, or was about to be committed. As a result, he called for assistance from Deputy Tracy Chance, a K-9 officer. Maddux returned to his patrol car, where he asked Fredrickson several additional questions. In response, Fredrickson reiterated that Mader and Romo-Uriarie were his parents, that his father was 60 years old, and that his parents had stayed in a motel in Minnesota while he stayed with his brother. Fredrickson then changed his story by saying that he, too, stayed in a motel.

After his second conversation with Fredrickson, Maddux returned to the suspects' car to ask Mader and Romo-Uriarie more questions. During this conversation, Mader and Romo-Uriarie told Maddux they worked for a company that manufactured homes. When asked whether Fredrickson was in school, they said that they thought he had graduated.

Maddux returned to his patrol car, where he had a third conversation with Fredrickson. Maddux told Fredrickson that "we had a problem, that the people in the vehicle were not his parents, that his parents did not live in Phoenix, they lived in Minnesota, and that he did not go to Minnesota to visit his brother." Although Maddux told Fredrickson he was not under arrest, he read him his *Miranda* rights.

Deputy Chance arrived with his drug dog, Fellow. Chance testified that he and Fellow had undergone drug detection training and had been successful on numerous occasions in discovering illegal drugs. Chance further testified that Fellow was capable of detecting the residual odors of drugs even after the drugs were no longer present. Chance also testified that Fellow had not been trained in the area of United States currency. Chance explained that when he conducted a free air sniff of the suspects' car, the drug dog showed a positive alert to the trunk area. Maddux, who was also a K-9 officer, testified that the dog showed a positive alert to the trunk area twice.

After the drug dog alerted to the trunk, Chance removed Mader and Romo-Uriarie from the car and read them their *Miranda* rights. Maddux asked each individual separately if he or she had any large amounts of cash. Fredrickson said he had $200, which he pulled out of his pocket. Mader indicated that he had approximately $1,000 and handed Maddux his billfold upon request. Romo-Uriarie was initially evasive about how much money she had.

When Maddux conducted a search of the car, he discovered a small suitcase in the trunk containing $37,980 in cash. The deputies arrested the three individuals because Maddux believed the cash was the proceeds of drug transactions or money laundering. Romo-Uriarie told Chance her purse contained more money. Maddux located the purse in the car and discovered $45,950 in cash. Romo-Uriarie also told Maddux that the suitcase belonged to Fredrickson. Maddux testified that he discovered $85,440 total. The cash was rubber-banded, and one large packet of cash was in a plastic sack. The deputies did not find any drugs during the search.

In addition, Chance discovered on Mader a handwritten sentencing guidelines grid applicable to drug crimes. Chance testified

that when he discovered it, Mader responded by smiling and stating that his son had gotten into trouble, and he wanted to know how much time his son was facing. Chance also discovered a subscription card to High Times magazine, featuring hydroponic units containing large marijuana plants, on Mader. The card advertised the "World's Best Grow Boxes."

The State charged Fredrickson, Mader, and Romo-Uriarie with unlawful acts involving proceeds derived from violations of K.S.A. 65-4142 and 21-3205 of the Act. In addition to the sentencing guidelines grid and the High Times subscription card, the trial court admitted into evidence a document entitled "First Amendment to Objection to Forfeiture" that Mader had filed in his companion civil forfeiture case and two court appearance bonds. Within the "First Amendment to Objection to Forfeiture," Mader alleged the $85,440 seized was a loan to Mader to replace bond money forfeited in an unrelated case in Pottawatomie County. The alleged loan agreement was made on January 21, 2003, 2 weeks before the defendants were arrested. The lender was identified as "Jesus R. Anaya." One bond, issued March 24, 1999, was in the amount of $50,000. The second bond, issued May 14, 2002, in the same case, was in the amount of $100,000. Although the bonds were issued in the same case, the first bond was captioned "State of Kansas v. Michael E. Coffee" and the second bond was captioned "State of Kansas v. Leroy J. Mader." The State asserted that "Michael E. Coffee" was Mader's alias.

After a bifurcated preliminary hearing, the trial court dismissed the charges against the defendants, holding: (1) that the initial stop of the car was a valid traffic stop; (2) that there was reasonable and articulable suspicion to continue the detention of the defendants beyond the scope and purpose of the original traffic stop; (3) that there was sufficient probable cause to search the car; and (4) that the State failed to meet its burden to show there was probable cause to believe a felony had been committed.

"Pursuant to K.S.A. 22-2902(3), a defendant shall be bound over if the evidence shows that a felony has been committed and there is probable cause to believe that the felony has been committed by the defendant. [Citation omitted.] The evidence need not prove guilt beyond a reasonable doubt, only probable cause.

[Citation omitted.] Probable cause at a preliminary examination signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. [Citation omitted.] The trial court must draw inferences favorable to the prosecution from the evidence presented at the preliminary examination. [Citation omitted.] The magistrate should not be concerned with the fact that the possibility of conviction is remote or virtually nonexistent. [Citation omitted.] Where the evidence tends to disclose that the offense charged was committed and the defendant committed it, the question is one for the jury to decide, even though the evidence is weak. [Citation omitted.]" *State v. Berg*, 270 Kan. 237, 238, 13 P.3d 914 (2000).

In reviewing the trial court's dismissal of a complaint, this court must examine the evidence de novo, using the same standard to weigh the evidence as the trial court used, that is, whether the evidence is sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the defendant's guilt. 270 Kan. at 238.

The defendants were charged as principals and as aiders and abettors in violation of K.S.A. 65-4142, which provides in pertinent part:

"(a) It is unlawful for any person knowingly or intentionally to receive or acquire proceeds, or engage in transactions involving proceeds, known to be derived from any violation of the uniform controlled substances act . . . .

"(b) It is unlawful for any person knowingly or intentionally to give, sell, transfer, trade, invest, conceal, transport, or maintain an interest in or otherwise make available anything of value which that person knows is intended to be used for the purpose of committing or furthering the commission of any violation of the uniform controlled substances act . . . .

"(c) It is unlawful for any person knowingly or intentionally to direct, plan, organize, initiate, finance, manage, supervise or facilitate the transportation or transfer of proceeds known to be derived from any violation of the uniform controlled substances act . . . ."

## A. DID THE STATE PRESENT SUFFICIENT EVIDENCE TO ESTABLISH PROBABLE CAUSE TO BELIEVE DEFENDANTS COMMITTED THE CRIME CHARGED?

In dismissing the complaint against the defendants, the trial court stated:

"In the case before the Court, there was no evidence presented of where the money found in the automobile came from. There was no evidence presented of when or where the Defendants received or acquired the money contained in the

automobile. What the State was able to prove was that the automobile containing the three Defendants was stopped in Kiowa County, Kansas, on February 5, 2003, and upon a search of the vehicle, $85,440 in United States currency was located. There was no evidence before the Court that the drug dog 'alerted' on the money. There is no evidence before the Court that the United States currency was tested to determine if any controlled substances were located upon the money. There was no evidence that any of the Defendants made any admissions regarding the source or purpose of the money. In short, there is simply no evidence, circumstantial or otherwise, viewed in the light most favorable to the State to support the inference that the money found in the possession of the three Defendants was received or acquired in violation of the Uniform Controlled Substances Act. Therefore, the State has failed to meet their requisite burden of proof to show that a felony crime has been committed."

The evidence presented by the State to establish probable cause to believe that the defendants had committed the crime charged was circumstantial. Circumstantial evidence may be the basis for a conviction. *State v. Dean,* 273 Kan. 929, 933, 46 P.3d 1130 (2002). The State argues that nine items of circumstantial evidence established probable cause in this case.

*Maddux was trained, experienced, and knowledgeable in drug enforcement.*

When defendants were arrested, Maddux had had 5 years of law enforcement experience, most of which he spent in drug enforcement. He had been a K-9 officer for 2½ years and had been involved in at least 30 large seizures of illegal drugs or United States currency. Maddux testified that illegal drugs in the United States often originate in Mexico, Columbia, and the southwestern states and are transported east and north to major metropolitan areas. Maddux further testified that Phoenix is associated with the drug trade. He stated that illegal drugs are often transported from the south on US-54 Highway. Maddux further stated that drug transporters may deliver drugs in exchange for money and then transport the money back to their place of origin. The State notes that the defendants had originated in Phoenix, traveled north and east to a major metropolitan area, that is, Minneapolis, and were traveling on US-54 back to their place of origin carrying a large amount of cash.

Fredrickson cites *State v. Chapman,* 23 Kan. App. 2d 999, 1010, 939 P.2d 950 (1997), in arguing that their place of origin, Phoenix, is not a fact that provides probable cause. He further argues that his inconsistent statements were the result of nervousness and that this court has stated that innocent citizens often exhibit nervousness when stopped by police.

*Avoided contact with law enforcement.*

The State argues that Fredrickson drove over the white line because he was surprised when he saw a patrol car. The State also maintains that when Fredrickson slowed to more than 10 miles per hour below the speed limit this was an indication that he was engaged in illegal activity and wished to avoid contact with a law enforcement officer.

*Inconsistent statements to Maddux.*

Fredrickson's statements to Maddux were inconsistent with the statements of Mader and Romo-Uriarie. Fredrickson stated Mader and Romo-Uriarie were his parents; Mader and Romo-Uriarie stated they were not married to each other and Fredrickson was not their son. Fredrickson said they had gone to Minnesota to visit his brother; Mader and Romo-Uriarie stated they had gone to talk to Fredrickson's father about borrowing a "semi" to haul produce. Fredrickson indicated he was a student in Arizona; Mader and Romo-Uriarie stated they thought Fredrickson had graduated. Fredrickson said Mader rebuilt alternators and Romo-Uriarie did not work; Mader and Romo-Uriarie said they built manufactured homes. When confronted with these inconsistencies, Fredrickson responded, "Uh-huh," without explaining the inconsistencies.

*Drug dog alerted to trunk of car.*

Fellow, who was trained to discover illegal drugs, alerted to the trunk of the car twice. Drugs were not found within the car, but Fellow was trained to detect residual odors of illegal drugs even when drugs were no longer present. The State explains the absence of drugs in the car by asserting that the defendants probably de-

livered the drugs in Minnesota, received payment, and were returning to Phoenix when they were arrested.

The defendants argue that the State failed to furnish any evidence that drugs were in the car, that drugs contaminated the money, or that the money was proceeds of an illegal drug transaction. They note that in *United States v. United States Currency, $30,060.00,* 39 F.3d 1039, 1042 (9th Cir. 1994), the Ninth Circuit found that 75% of the cash circulated in Los Angeles was contaminated with drug residue, which, in this case, could have explained Fellow's positive alert to the trunk.

Nevertheless, the federal court finding in *United States Currency, $30,060* is distinguishable from the present appeal because the federal appeal involved a factual finding applicable to the Los Angeles area in the mid-1990s. Furthermore, this factual assertion cannot be found in the record on appeal. Parties must key factual statements to the record on appeal, and material without such reference is presumed to be without support. *Kenyon v. Kansas Power & Light Co.,* 17 Kan. App. 2d 205, 206, 836 P.2d 1193 (1992).

*Large amount of cash found in car.*

Before searching the car, Maddux and Chance asked each defendant if the car contained any large amounts of cash. Fredrickson and Mader responded that it did not, and Romo-Uriarie was evasive. Notwithstanding, Maddux and Chance found cash totaling $85,440. The State argues that this unusually large amount of cash, combined with the defendants' failure to acknowledge its presence, indicates the money was drug proceeds to which the defendants did not want to be associated. The State argues that ordinary, innocent individuals do not normally carry over $85,000 in cash with them on long cross-country trips. The State further argues that if an individual was transporting a large amount of cash that was "clean," he or she would admit to its presence when questioned.

*Handwritten sentencing grid applicable to drug crimes found on Mader's person.*

The State argues that the presence of the sentencing grid found on Mader's person, combined with Mader's reaction when it was

found—he smiled—and his explanation—his son was facing prison time—was evidence Mader was involved in drug trafficking and the money found in the car was drug proceeds.

*Subscription card found on Mader's person.*

The State argues that the presence on Mader's person of the High Times subscription card featuring hydroponic units containing large marijuana plants and advertising the "World's Best Grow Boxes" clearly indicates Mader was exposed to, or in, the drug culture and had an interest in drug production activities. The State notes that when Chance asked Mader if he was tired of hauling and was going to start growing, Mader just laughed. The State argues that Mader's possession of the subscription card and his reaction to Chance's question are probative evidence of Mader's interest in, and association with, the drug culture.

*Defendants' assertion that money was a loan.*

The State argues that the defendants' assertion that the money was the proceeds of a loan borrowed to replace forfeited bond money is not credible. The State notes that the loan was not secured by collateral and no guarantor was required. The State argues that a rational person would not loan $100,000 in cash to a criminal defendant facing felony drug charges and possible prison time who has already forfeited one bond. The State further argues that a rational person would not loan a large sum of cash to an individual earning the wages of a builder of alternators or manufactured homes because such a borrower cannot make the monthly payments of over $4,000 and the interest payment of $15,000, due within 3 months of the date of the agreement.

The State also asserts that the bond amount was either $50,000 or $100,000, but the cash found totaled $85,440. The State argues that the amount of cash found was odd in light of the forfeited bond amount. Romo-Uriarie and Mader argue that the odd amount of cash is easily explained. They allege Mader paid 15% of the bond to the bondsman, which was $15,000 in this case. They further allege Mader was intending to use the $85,440 found in the car to

pay the remaining $85,000 owed to the bondsman after the bond was forfeited.

The State also notes that when the defendants were arrested, they were headed southwest toward Phoenix, in the opposite direction of Pottawatomie County, where the forfeited bond was issued. The notary public seal on the borrowing agreement indicates the loan was made in Arizona. The State argues that a sensible person would not borrow $85,440 in cash and then travel with it from Phoenix to Minnesota and then back again without stopping in Pottawatomie County to deliver the money. The State further argues that a sensible person would simply mail a check to the bondsman, rather than travel cross-country with a large amount of cash.

The State argues that the defendants' behavior and statements regarding the money indicate the money was not the proceeds of a loan. The State maintains that the defendants would have admitted to the presence of the money if a legitimate loan was its source. The State notes that Romo-Uriarie apparently lied when she told Chance they were going to "buy houses" with the money.

The State also points out that approximately $45,000 of the total cash was found in Romo-Uriarie's purse and approximately $37,000 was found in Fredrickson's suitcase in the trunk. The State argues that a rational person would not borrow $100,000 in cash and then give it to others to hold during a cross-country trip.

*Mader charged with drug-related crime in another county.*

The State notes that Mader was charged with possession of narcotics with intent to sell in Pottawatomie County. The State argues that this charge and Mader's apparent use of an alias in the Pottawatomie County case are evidence that the money found in the car was drug proceeds.

## B. DID THE DISTRICT COURT PROPERLY RELY ON *STATE v. McGREW*?

In dismissing the charges against the defendants, the trial court stated that even if the State had been able to present evidence that the money found was drug proceeds, the State would have had the

additional burden imposed by *State v. McGrew,* 29 Kan. App. 2d 1051, 36 P.3d 334 (2001). *McGrew* required the State to show that one other than the defendants first derived proceeds from a violation of the Act. Moreover, the State had to prove that those proceeds were received or acquired by the defendants in another transaction. The trial court held that the State failed to meet this burden.

In *McGrew,* this court affirmed the defendant's conviction of possession of cocaine with intent to sell and reversed his conviction of unlawful acquisition of drug proceeds. A proper analysis of *McGrew* requires a lengthy restatement of the court's discussion:

"In order to be convicted under K.S.A. 2000 Supp. 65-4142, a defendant must acquire or receive proceeds known to be derived from a violation of the Uniform Controlled Substances Act. The verb phrase 'known to be derived from a violation of the uniform controlled substances act,' indicates the proceeds, *before* the offender acquires or receives them, must have been derived from a violation of the Act, and the offender must know of that fact.

"As the title to the Act section from which K.S.A. 2000 Supp. 65-4142 is taken indicates, this is a money laundering statute. See Uniform Controlled Substances Act, 9 U.L.A. 547 § 412 (1994) (entitled 'Money Laundering and Illegal Investment; Penalty'). The official comment to the section explains this 'section makes it unlawful . . . [to] acquire . . . finances or assets that are actually *known to have been derived* from or are intended to further narcotics trafficking.' The emphasized text is grammatically stated in the past tense. Thus, in the present case, the money itself, *before* McGrew's acquisition or receipt of it, must have been derived from a violation of the Act, and he must have known that fact.

"Mere receipt or acquisition of money or other proceeds from the sale of a controlled substance will not support a charge under K.S.A. 2000 Supp. 65-4142 *provided* the money given the seller in exchange for the controlled substance was itself not a proceed derived in violation of the Act, or if it was, the seller did not actually know of that fact.

. . . .

"We recognize our holding conflicts conceptually with another panel's decision in *State v. Betz,* 29 Kan. App. 2d 575, 30 P.3d 1037 (2001). The *Betz* panel held a violation of K.S.A. 65-4142 and sale of drugs under K.S.A. 65-4161 were multiplicitous and set aside the conviction for criminal acquisition of drug proceeds.

"We do not feel the two charges in the present case are multiplicitous. Here, the State simply failed to establish the separate facts necessary to support a conviction of criminal acquisition of drug proceeds. It is obvious to us the State cannot charge sale of a controlled substance or possession with intent to sell and criminal acquisition of drug proceeds based on the same, single transaction. Thus, the

legislature could not have intended K.S.A. 2000 Supp. 65-4142 to apply to a single transaction like the one at bar.

"For a conviction of the money laundering statute, K.S.A. 65-4142, one other than defendant must first derive proceeds from a violation of the Act, then those proceeds must be received or acquired by defendant in another transaction." 29 Kan. App. 2d at 1053-54.

If the *McGrew* holding were applied to the facts of the instant case, the State must establish probable cause to believe someone other than the defendants first derived proceeds from a violation of the Act and the defendants transported or facilitated the transportation of those proceeds thereafter. This scenario would require two transactions: an exchange of drugs and money between a seller and buyer and a later transfer of the proceeds to the defendants for transportation.

Nevertheless, the State argues that the trial court's reliance on *McGrew* is misplaced. The State notes that McGrew was charged only with acquiring or receiving drug proceeds in violation of K.S.A. 65-4142(a). The defendants, however, in the instant case were charged not only with acquiring or receiving drug proceeds, but also with transporting or facilitating the transportation of drug proceeds and several other violations of K.S.A. 65-4142(a), (b), and (c). The State argues that the holding in *McGrew* can be logically understood only in the context of a violation of K.S.A. 65-4142(a).

The State's argument is supported by the following hypothetical: Buyer gives Seller cash, and Seller gives Buyer drugs. Seller then drives 200 miles to deliver the proceeds to Source. Source then resupplies Seller with drugs, and the drug trafficking process continues. Under *McGrew*, Source could be convicted of unlawfully receiving drug proceeds in violation of K.S.A. 65-4142(a) because one other than Source, *i.e.*, Seller, first derived proceeds from a violation of the Act, and then those proceeds were received by Source in another transaction. Seller, on the other hand, clearly transported drug proceeds in violation of K.S.A. 65-4142(b) and (c). However, under *McGrew*, Seller could not be convicted under K.S.A. 65-4142(b) and (c) because Seller, himself, derived the proceeds in violation of the Act. The State argues that this result is illogical because the act of transporting drug proceeds is separate

and apart from the sale of drugs. As a result, the State urges that this court hold that the rule set forth in *McGrew* applies only in the context of violations of K.S.A. 65-4142(a).

The State's argument is persuasive. The logic upon which the *McGrew* court based its decision is inapplicable in the context of K.S.A. 65-4142(b) and (c). The *McGrew* court noted that the language of K.S.A. 65-4142(a) is past tense, *i.e.,* a defendant must "receive or acquire proceeds . . . *known to be derived* from a violation of [the Act]." (Emphasis added.) The court reasoned that *before* the defendant receives the proceeds, they must have been derived from a violation of the Act; therefore, one other than the defendant must first derive the proceeds from a violation of the Act, and then those proceeds must be received by the defendant in another transaction. 29 Kan. App. 2d at 1053-54.

The *McGrew* court's reasoning is inapplicable in the context of K.S.A. 65-4142(b). A defendant violates K.S.A. 65-4142(b) by, *inter alia,* transporting money that the defendant knows *is intended to be used* for the purpose of committing a violation of the Act. This language is not past tense; rather it refers to future action. A defendant driving with $85,000 in cash to his or her drug source intending to buy drugs is obviously violating K.S.A. 65-4142(b) regardless of the origin of the money and regardless of whether he, she, or someone else previously derived the money from a violation of the Act.

The *McGrew* court's reasoning also is inapplicable in the context of K.S.A. 65-4142(c). A defendant violates K.S.A. 65-4142(c) by, *inter alia,* transporting proceeds *known to be derived* from a violation of the Act. This language is past tense; however, the defendant clearly violates this subsection by selling drugs to a buyer and then transporting the proceeds to a third party. The transportation is separate and apart from the sale. Therefore, although the defendant was the one who derived the proceeds from a violation of the Act, rather than "one other than defendant" as *McGrew* requires, the defendant violated K.S.A. 65-4142(c) by transporting the proceeds.

In summary, this court must draw inferences favorable to the prosecution from the evidence presented. *Berg,* 270 Kan. at 238.

The defendants made wholly inconsistent statements to Maddux. The drug dog alerted to the trunk twice. The amount of cash found was unusually large. The defendants would not acknowledge its presence. A High Times subscription card and a sentencing grid applicable to drug crimes were found on Mader's person. The defendants' assertion that the money was the proceeds of a loan borrowed to replace forfeited bond money was not credible. Finally, Mader was charged with a drug-related crime in another county. While any one of these items of circumstantial evidence may not provide probable cause standing alone, when considered as a whole, it is clear the evidence is sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. See *Berg,* 270 Kan. at 238.

Reversed and remanded for reinstatement of the charges.