UNITED STATES of America, Plaintiff,

v.

$86,020.00 IN U.S. CURRENCY,
Defendant.

No. 96–CV–125–TUC–ACM.

United States District Court,
D. Arizona.

Nov. 12, 1997.

Janet Napolitano, U.S. Atty., District of Arizona, Henry Z. Brown, Asst. U.S. Atty., Tucson, AZ, for U.S.

Alfred S. Donau III, Donau & Bolt, Tucson, AZ, for $86,020.00 in U.S. Currency, Cecilio Tavares.

### ORDER

MARQUEZ, Senior District Judge.

On February 27, 1996, the United States of America (Government) filed a civil cause of forfeiture alleging probable cause existed to believe $86,020 in U.S. Currency was used to facilitate and/or represented the proceeds of drug and/or narcotic trafficking. On May 28, 1996, Cecilio Tavares filed a Notice of Claim stating he was the lawful owner of the currency and demanding its prompt return.

Presently before the Court are the Government's Motion for Summary Judgment and Claimant's Cross–Motion for Summary Judgment. The Government asks the Court to issue an order determining probable cause as a matter of law. Claimant also seeks summary judgment on the issue of probable cause. Alternatively, Claimant argues there remain issues of genuine material fact precluding the entry of summary judgment in favor of the Government.

### I. *The Government's Burden:*

The Government instituted the present forfeiture pursuant to the Controlled Substances Act. It provides for the forfeiture to the United States of:

> All moneys ... furnished or intended to be furnished by any person in exchange for a controlled substance ... all proceeds traceable to such an exchange, and all moneys ... used or intended to be used to facilitate any violation of this subchapter ...

21 U.S. § 881(a)(6).

The burden of proof in forfeiture proceedings is spelled out in 19 U.S. § 1615. Before a forfeiture will lie, the government must first demonstrate probable cause to believe the seized property was involved with illegal drug transactions.

The government cannot prove probable cause unless the "aggregate of facts" give rise to more than mere suspicion that the property was exchanged for or intended to be exchanged for drugs. The presence or absence of any single fact is not dispositive. *United States v. Padilla,* 888 F.2d 642, 644 (9th Cir.1989). To pass the point of mere suspicion and reach probable cause, it is necessary to demonstrate by some credible evidence the probability the money was in fact connected to drugs. *United States v. $30,060.00,* 39 F.3d 1039, 1041 (9th Cir.1994).

In this case, the Government submitted the following: On September 16, 1995, DEA Agent Valerie Stevenson (Agent Stevenson) was contacted by the Dallas–Fort Worth Airport Group and informed that on September 16, 1995 at 12:07 a.m., a Cecil and Paul Rodriguez made reservations to travel to Tucson, Arizona from West Palm Beach, Florida on American Airlines. They were ticketed at 7:26 a.m. for the 7:58 a.m. flight, paid $641 cash for each one way ticket, did not check any bags and were occupying seats 22A and 22B. (Affidavit of DEA Agent Valerie Stevenson (Stevenson Affidavit) at 1.)

DEA agents established surveillance at the Tucson International Airport, obtained a description of the individuals seated in 22A and 22B and stopped the two men. When asked if he was Mr. Rodriguez, the older man identified himself as Cecilio Tavares (Claimant). When asked if they had their airline tickets, the younger male Pedro Tavares said they had left them on the plane. A detective noticed Claimant had the airline boarding stub sticking out of his pocket with the name Rodriguez. When confronted with this, Claimant provided a U.S. Military ID card in the name of Tavares. Agents later learned Claimant had been discharged from the Army in June of 1995 and left a forwarding address for Miami, Florida. (Stevenson Affidavit at 1–3.)

Agents asked the men why they were traveling under assumed names. Pedro Tavares stated his friend, Danny Rodriguez, had given them frequent flier tickets and that was why the names were different; they had obtained the tickets from Danny Rodriguez on September 15, 1997. Agent Stevenson pointed out the tickets had been purchased that morning, September 16, 1997 and not the day before. Agents later found passenger receipts from American Airlines in the names of Cecil Rodriguez and Paul Rodriguez. (Stevenson Affidavit at 1–3.)

Agents obtained consent to search the men's carry on luggage. In Claimant's black suitcase, agents found a large amount of cash in a shoe box. Claimant stated the money belonged to a friend named Willy; he did not know his last name. He was to deliver the money to a hotel. Claimant later stated he was going to attend logistics school in Fort Huachuca and was to meet Willy in Fort Huachuca. Claimant gave a third version, stating the money was his and he was going to give Willy the money to buy a house. He could not qualify for a loan and had taken $48,000 out of several banks. Claimant did not have a bank receipt or the bank account numbers with him. The actual amount of cash seized was $86,020. (Stevenson Affidavit at 2.)

■ A narcotics detection dog later alerted positive for the presence of narcotics on the money. (Stevenson Affidavit at 2). One counterfeit $20 bill was found by bank personnel. (DEA Report of Investigation, Agent Stevenson, 9–22–95 (Stevenson Report) at 4.) [1]

Agents also found a can of dog and cat repellent, a heat sealer with an instruction manual and plastic bags in Claimant's black suitcase. In his green bag, agents found four rolls of wrapping tape. Claimant explained the heat sealer and tape were for boxes he was going to mail. (Stevenson Affidavit at 2.)

In Pedro Taveres' suitcase, agents found two unused and two used rolls of the same tape. Agents also found another American Airlines ticket receipt in the name of Pedro Taveres for travel on September 13, 1995, from New York to Miami. (Stevenson Affidavit at 2.)

Agents seized the currency and other items found in the bags. Agents later contacted Fort Huachuca and were advised they had no record of a Cecilio Tavares checking in at the base. A criminal history check of Pedro Tavares disclosed numerous aliases and arrests for burglary, fraud, receiving a stolen vehicle, receiving stolen property, petty and grand larceny, criminal mischief and assault. (Stevenson Affidavit at 3.) A DEA Naddis check on Pedro Tavares disclosed the use of five additional aliases. (Stevenson Report at 5.)

According to Agent Stevenson, drug couriers frequently do not know the amount of the currency they are transporting and frequently fly under aliases, pay in cash for last minute one way flights and make cash payments for marijuana. Additionally, plastic bags, tape and heat sealers are used by drug traffickers to package marijuana. The false and conflicting information given by Pedro and Cecilio Tavares about their identities and their travel provided probable cause to be-

1. The government may establish probable cause by relying on otherwise inadmissible hearsay because the question of probable cause depends not upon the admissibility of the evidence upon which the government relies but only upon the legal sufficiency and reliability of the evidence. *United States v. $405,089.23 U.S. Currency,* 122 F.3d 1285, 1289 (9th Cir.1997).

lieve that the money seized was drug related. (Stevenson Affidavit at 3–4.)

■ The Court is satisfied the Government demonstrated by credible evidence that probable cause existed to believe the currency was related to narcotics trafficking.[2] With respect to the narcotics dog's positive alert to the money, the Court notes this is not sufficient evidence in and of itself to establish probable cause for forfeiture. A great deal of our currency (as much as seventy-five percent of all circulated currency in Los Angeles) is contaminated with the residue of cocaine or other controlled substances.[3] The mere fact of *prior* contamination does not establish the money was actually exchanged for or intended to be exchanged for drugs by the person *currently* in possession. Rather, probable cause is established only when the "aggregate of facts," over and beyond the positive dog alert, demonstrates the money's connection to drugs. *U.S. v. U.S. Currency, $30,060,* 39 F.3d at 1042; *United States v. $215,300 in U.S. Currency,* 882 F.2d at 417, 419 (9th Cir.1989), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3242, 111 L.Ed.2d 752 (1990).

The Court is also mindful of the fact the Government did not find illegal contraband on the Claimant's person or in his belongings. Even without the presence of drugs or drug paraphernalia, carrying a large sum of cash is *strong evidence* of some relationship with illegal drugs. *United States v. U.S. Currency, $83,310.*78, 851 F.2d 1231, 1236 (9th Cir.1988); *$215,300 in U.S. Currency,* 882 F.2d at 419; *United States v. $5,644,540 in U.S. Currency,* 799 F.2d 1357, 1363 (9th Cir.1986); *Padilla,* 888 F.2d at 644; and *United States v. $67,220 in U.S. Currency,* 957 F.2d 280, 285 (6th Cir.1992).[4]

In addition to the positive dog alert and the large amount of currency, the Court found the following undisputed facts indicative of probable cause: 1) Claimant was ticketed at 7:26 a.m. for a 7:58 a.m. flight, paid cash for a one way airline ticket and did not check any luggage. *United States v. Thomas,* 913 F.2d 1111, 1116 (4th Cir.1990) (traveling without baggage is typical of drug traffickers who often fly into a city intending to make their drug contact and immediately depart; arriving at the ticket counter a short time before departure and paying cash for a one-way ticket is a pattern employed by drug couriers presumably to avoid extended surveillance and to maintain anonymity); 2) Claimant was traveling under a false name. *United States v. $175,260,* 741 F.Supp. 45, 48 (E.D.N.Y.1990) (the aggregate of facts included claimant traveling under a false name and giving misleading information to DEA agents); 3) Upon discharge from the Army in June of 1995, Claimant left a forwarding address in Miami, Florida; in September of that year, Claimant traveled from Palm Beach, Florida to Tucson, Arizona. *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1, (1989) (personal characteristics of drug couriers included a short trip to a major source city for drugs); 4) Claimant was not able to produce bank receipts or account numbers evidencing the cash he claims to have withdrawn from several banks. *$175,260,* 741 F.Supp. at 47 (pertinent circumstances included no receipt for the cash); 5) Claimant did not know Willie's last name, a man he was admittedly going to meet to give $86,020 for the purchase of a house. *$5,644,540 in U.S. Currency,* 799 F.2d at 1363 (courts may take into account "common experience considerations" to acknowledge recognized drug-smuggling practices);

---

2. The Court was not persuaded by the Government's argument that "same day" purchase of an airline ticket was probative of illegal drug activity. (Reply to Claimant's Opposition to Motion for Summary Judgment and Response to Claimant's Cross–Motion for Summary Judgment, at 4). The airline tickets were purchased the *evening before* Claimant's flight at 12:07 a.m., about eight hours prior to departure time.

3. The Sixth Circuit noted that residue from cocaine contaminates as much as 90% of the cur-

rency in circulation in the United States. *United States v. $5,000 in U.S. Currency,* 40 F.3d 846, 849 (6th Cir.1994).

4. The Second Circuit characterized an amount as low as $2,500 as being substantially greater than is commonly kept in residential premises by law-abiding wage earners. *United States v. $2,500 in U.S. Currency,* 689 F.2d 10, 16 (2d Cir.1982), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984).

and 6) Claimant's carry on bags contained animal repellent, a heat sealer with instructions, plastic bags and wrapping tape. *United States v. $93,685.61 in U.S. Currency,* 730 F.2d 571, 572 (9th Cir.1984), *cert. denied,* 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 61 (1984) and *Padilla,* 888 F.2d at 644 (circumstantial evidence of drug transactions is sufficient to support the establishment of probable cause in a forfeiture proceeding).

On the merits of the Government's showing, the Court finds the Government made the requisite showing of probable cause to believe a nexus existed between the seized currency and illegal drug activity. The Government produced reliable evidence to give rise to more than mere suspicion the currency was exchanged for or intended to be exchanged for drugs.

## II. *The Claimant's Burden:*

■ Once the government has demonstrated probable cause to institute the forfeiture action, the burden shifts to the claimant to prove by a preponderance of evidence the money was *not* involved with illegal drug transactions. *Padilla,* 888 F.2d at 645.

■ Claimant attested that after 27 years in the service, he took an early retirement and obtained an honorary discharge on November 4, 1995; he left the service in August of 1995 because of 87 days of accrued leave time for which he received full salary. (Deposition of Cecilio Tavares, 12–19–96 (Claimant's Deposition) at 8–10.)

Claimant came to Tucson on September 16, 1995, in order to meet with "Willie" who was going to help him purchase a home in Boynton Beach, Florida. (Statement of Facts in Support of Claimant's Opposition to Government's Motion for Summary Judgment and Cross–Motion for Summary Judgment (Defendant's SOF) at ¶ 10.) Claimant did not know Willie's last name. Willie made Claimant's flight reservations and gave him an 800 number so he could call him to meet in Ft. Huachuca. (Claimant's Deposition at 12, 20–21.) Claimant attested he was trying to relocate his family from Illinois to Florida and was in transit between the two cities. He was trying to buy a home in Florida but was having difficulty qualifying for a home.

He had made several attempts to qualify, coming up with increasing amounts of money for a down payment. Unable to get approval for the purchase, Claimant had to come up with an even larger down payment. Willie was going to purchase the home for him and the seller of the property in Boynton Beach, Florida was going to transfer all the papers in six months. (Claimant's Deposition at 11–13, 20–23.)

When asked why he didn't wire Willy the money or send him a cashier's check, Claimant stated, "Before I release any of my money, okay, he would have to come up with a plan for me. He would have to convince him that this thing—that he could have bought a home. I wasn't going to give him the money with no paperwork or anything like that." (Claimant's Deposition at 23, lns. 5–7.)

Claimant's brother, Pedro Tavares, was living in New York at the time and had traveled to Florida on vacation to visit. Not wanting to stay alone in Tucson, Claimant invited his brother to travel with him to Tucson to do the closing. The guy Claimant was supposed to contact did not want to see him. Claimant called his lawyer Mr. Stone and was told to go to New York to see him. Claimant and his brother stayed in Ft. Huachuca only for the day; that evening, Claimant went back to New York. (Claimant's Deposition at 10–12.)

According to Claimant, the home he was going to purchase in Boynton Beach, Florida cost $161,000. At the time of his deposition, Claimant was not able to provide the name of "the lady" who handled the purchasing agreement. Claimant did state that this lady was the person who instructed Claimant to call Willie. Claimant was not able to provide the address of the home he was purchasing, (Claimant's Deposition at 12–13, 20), but stated that he *could provide* the information to the government, "Oh boy, I don't have that here, but I can provide you that. I mean, I got a packet and the whole nine yards." (Claimant's Deposition at 13, lns. 14–15.) "I have a bunch of things, you know, on the house. I think I can find them." (Claimant's Deposition at 14, ln. 1).

According to Claimant, he had at one point given the lady 20 percent or $42,000 for the

purchase of the house.[5] When asked why he did not give the lady money in the form of a check or money order, Claimant replied that the lady said the money was to be placed in an escrow account. Claimant added that he only put money in a checking or savings account whenever he needed to pay bills. (Claimant's Deposition at 14, 17.)

Claimant explained he obtained the large sum of money by withdrawing money from his credit cards and two businesses. One year he also received travel expenses from the Army amounting to $77,000.00. Claimant explained, "I was traveling 325 days a year ... I was getting between 60 and $70,-000 a year in travel. Out of that money I had to pay my airline tickets, rent a car, lodging and food. Okay. Whatever was left was in my pocket ... Instead of giving me the airline tickets they pay me .30 a mile. I also would pocket that money." (Claimant's Deposition at 18, ln. 25; 19, lns. 1–5.)

Regarding the inconsistent statements he gave to police at the time of his stop, Claimant stated he packed the money himself and he knew how much it was. He denied telling agents $48,000 was the total amount of the money; what he told officers was $48,000 of the money came from withdrawals from credit cards. Claimant denies telling officers he was going to Ft. Huachuca to attend a logistics school. He denies stating the money was Willie's and he does not recall telling anyone he was going to deliver the money to a hotel. (Claimant's Deposition at 19–21.)

According to Claimant, the reason he was carrying the other items in his belongings (heat sealer, packaging tape and dog and cat repellant) was because at the time he came out here (Tucson), he was moving between Rock Island (Illinois) and Florida and had left those items in his bag. He did not take them out and didn't have any place to leave them anyway. With respect to the animal repellant, Claimant stated he had a neighbor in Rock Island whose dog bothered him a lot; that's what he used on the outside. Regarding the rolls of packaging tape, he stated they were packing somewhere around 900 boxes and when he moved from Rock Island, he moved almost 14,000 pounds worth of furniture in a tractor trailer. Claimant denied telling the officers the heat sealant and packaging tape were for boxes he was going to mail; he told them when he moved from Rock Island, the company left two boxes of tape. (Claimant's Deposition at 21–22.)

When asked why he was traveling under another name, Claimant attested that when Willie made the airline reservations, he gave Claimant only a control number that he then gave to the ticket counter at the airline. Claimant was not able to explain why his brother told agents the tickets were given to him by Danny Rodriguez and Danny Rodriguez was someone Claimant knew. Claimant denied knowing anyone by that name. (Claimant's Deposition at 23–24.)

According to the Government, Claimant's statements regarding the source of the currency are inaccurate and untrue. A DEA analysis of Claimant's credit card statement revealed no substantial nexus could be attributed to cash loans from Claimant's multiple credit card accounts and the currency at issue. The analysis revealed only $8,136 in real estate equity. Furthermore, the Defense Finance and Accounting Service located in Claimant's last duty station revealed all travel voucher monies are used only to reimburse *actual* expenses and any excess is to be reimbursed to the government. (DEA Report of Investigation, Agent Stark 5–16–97.)

The Court finds it inconceivable that Claimant would incur the expense of two airline tickets and the time to travel across the United States from Palm Beach, Florida to Tucson, Arizona for one day in order to meet with a man whose last name he did not know, but was referred to by a lady whose name he was not able to provide, about a real estate venture involving the purchase of a home in Florida, the address of which Claimant was not able to provide. Claimant's same day return travel back across the Country to New York in order to meet with his lawyer is equally implausible.

---

**5.** Although not a deciding factor, the Court notes that twenty percent of $161,000 is $32,200 and not $42,000.

Claimant gave testimony he was going to give Willie $86,020 to purchase this home and the cost of the home was $161,000; Claimant never provided written documentation to support this. Nor did Claimant explain why he did not simply use the $86,020 (well over 50% of the cost of the home) as a down payment, thereby obviating the need to travel across the Country with the money. Claimant knew on November 25, 1996, the Government would be taking his deposition. (Government's Notice of Taking Deposition). Claimant had notice he would be questioned about the origin and purpose of the currency yet he appeared at his deposition empty handed. During his deposition on December 19, 1996, Claimant stated he thought he could find all the paperwork to prove his contentions. He stated he could provide the documentation to the Government. Eight months later, the parties filed their respective Motions for Summary Judgment. Claimant failed to provide *any* documentation whatsoever in support of his claim. Unable to locate the real estate documents, Claimant could have obtained affidavits from the lady who set up the deal in Florida, from his Tucson contact Willie, as well as from his attorney Mr. Stone in New York. Unable to locate the original bank receipts showing cash withdrawals totaling $48,000, Claimant could have obtained bank copies.[6]

Claimant's contentions are unsubstantiated. The Court finds that Claimant failed to carry his burden of proving by a preponderance of the evidence that the currency was not involved with illegal drug transactions. Claimant is not entitled to recover the money.

### III. The Appropriateness of Summary Judgment:

Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgement if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The party seeking summary judgment carries the burden of showing there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)., *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

Once the party seeking summary judgment has met their burden by presenting evidence which, if uncontradicted, would entitle it to a directed verdict at trial, the burden shifts to the nonmoving party to present specific facts showing such contradiction is possible. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 950–52 (9th Cir.1978.), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979).

In meeting its burden, a party may not rest upon the mere allegations or denials of the adverse party's pleading. Fed.R.Civ.P. 56(e). Nor can the nonmoving party simply rely on vague assertions that additional discovery will produce needed but unspecified facts. Fed.R.Civ.P. 56(f); *$5,644,540.00 in U.S. Currency*, 799 F.2d at 1363.

Furthermore, when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In essence, the inquiry is whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." It follows from these settled principles that if the factual context renders the non-movant's claim implausible, that party must come forward with more persuasive evidence to support their claim than would otherwise be necessary. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

The Court finds that the Government met its burden of showing there are no genuine issues of material fact. Even if the Court

---

6. Having previously forwarded savings account information to the Government, Claimant knew how to reach opposing counsel. (Claimant's Deposition at 18, ln. 8.)

believes Claimant's assertions regarding his alleged inconsistent statements and his explanations regarding the animal repellent and packaging items, viewing the record as a whole, the remaining *uncontradicted* evidence is so one sided that the Government must prevail as a matter of law. The evidence is not such that a jury could reasonably find for Claimant.

Based upon the aggregate of undisputed facts in the record, the Court finds that the Government demonstrated as a matter of law that it had probable cause to believe the currency was related to illegal drug transactions. Claimant did not meet his burden on rebuttal of proving that the money had legitimate origins or objective.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Document 37) is GRANTED.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Document 40) is DENIED.

**IT IS FURTHER ORDERED** that Judgment of Forfeiture be entered accordingly.