NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

In the Matter of:

TWO HUNDRED FIFTY THOUSAND ONE HUNDRED ONE DOLLAR
AND SIXTY CENTS ($250,101.60) IN UNITED STATES CURRENCY ET
AL., AS DESCRIBED IN THE ATTACHED APPENDIX.

STATE OF ARIZONA, *Plaintiff/Appellee,*

*v.*

MELISSA RIVERA, *Claimant/Appellant.*

No. 1 CA-CV 15-0219
FILED 5-3-2016

Appeal from the Superior Court in Maricopa County
No.  CV2012-010729
The Honorable Katherine M. Cooper, Judge

**AFFIRMED**

COUNSEL

Maricopa County Attorney's Office, Phoenix
By Peter S. Spaw
*Counsel for Plaintiff/Appellee*

Law Office of Frank Adamo, Phoenix
By Frank Adamo
*Counsel for Claimant/Appellee*

---

## MEMORANDUM DECISION

Judge Kenton D. Jones delivered the decision of the Court, in which Presiding Judge Diane M. Johnsen and Judge Patricia A. Orozco joined.

---

**J O N E S**, Judge:

¶1        Melissa Rivera appeals from the trial court's order directing forfeiture of $250,101.60 in U.S. currency (the Currency).  For the following reasons, we affirm.

## FACTS[1] AND PROCEDURAL HISTORY

¶2        In May 2012, while patrolling a highway commonly used for narcotics trafficking, an officer with the Buckeye Police Department observed a vehicle exceeding the posted speed limit and performed a traffic stop.  The driver, Julio Rivera, stated he had traveled to Phoenix from California three days earlier to see his father, for whom he had no phone number, but visited his cousin instead.  He could not provide an address for either family member.  The officer later discovered Julio had received a traffic citation from the California Highway Patrol just one day prior to the stop, which was during the period he told the officer he had been in Arizona.

¶3        Julio consented to a search of the vehicle, and the officer discovered a number of bulk grocery items, including a box of kitty litter and a box of laundry detergent that appeared to have been opened and resealed and weighed less than indicated on the boxes.  Julio claimed he had used his cousin's discount store membership to purchase the items before returning to California; yet, a membership card for the same discount store, issued in Julio's name, was found in his possession.  After Julio was arrested for speeding, a canine trained to alert to the presence of

---

[1]        We view the evidence in the light most favorable to upholding the trial court's order. *In re U.S. Currency in the Amount of $26,980.00*, 199 Ariz. 291, 293, ¶ 2 (App. 2000) (citing *In re One Residence Located at 4030 W. Avocado*, 184 Ariz. 219, 219 (App. 1995), and *In re 1978 Dodge Trans-Van*, 129 Ariz. 362, 363 (App. 1981)).

marijuana, methamphetamine, cocaine, and heroin was brought to the scene and alerted on the kitty litter box.

¶4            The officer opened both suspicious boxes and discovered twenty-one vacuum-sealed bundles of U.S. currency, totaling $249,915. At trial, officers with extensive experience in drug interdiction testified re-sealing packages and using kitty litter and detergent are common for "persons involved in trafficking and narcotics . . . in the hopes that it seals or prevents a dog from getting to the scent of any odor that might be on the currency." Additionally, the nature of the Currency supported a link to illegal drug trafficking because it was comprised primarily of twenty-dollar bills and grouped into packets of approximately $5,000 each, making it easy to count during a "quick transaction." Moreover, Julio's direction of travel — south — was consistent with the movement of drug money into Mexico.

¶5            When the officer questioned Julio about the Currency, he stated his cousin had given it to him to transport to Mexico and estimated the total sum was $50,000. According to the officer, the discrepancy between the actual amount of the Currency, and the amount Julio said he thought he was transporting, was significant because people transporting money derived from illegal activities are often just couriers and are "not told exactly what they have."

¶6            Three months later, in response to the State's notice of pending forfeiture, Julio filed an affidavit averring the Currency belonged to his sister, Melissa. He explained he worked for Melissa in an "ATM business" and that the Currency was "obtained through the legal means of collection from the ATMs owned by his sister's business." The State then filed a complaint alleging the Currency "constituted proceeds of a transaction involving prohibited drugs" and was subject to forfeiture. Melissa answered the complaint, alleging she had an interest in the Currency and it was exempt from forfeiture.

¶7            At the hearing, Melissa testified she obtained the Currency by importing medical equipment from China and then exporting the equipment to Mexico. She testified she dealt primarily in cash because she did not trust banks and law enforcement. According to Melissa, although she made $300,000 between 2009 and 2012 performing these activities, "it [was] not an official business" but "something [she] would just do," and therefore, she did not keep any records, did not report her income to any state or federal revenue service, and did not declare to those regulating border activity that she was carrying large sums of cash across the United States-Mexico border.

¶8            Regarding the funds found in the kitty litter box, Melissa testified she had asked Julio, who was living with her in California at the time, to pick up that money from a customer at a house in Phoenix. She also testified the funds found in the detergent box were her savings, which she had previously kept under her bed, but had given to Julio to deposit at her bank, seven minutes away from their California home, so she could use it to purchase an expensive piece of equipment. She did not provide any receipts or other business records to support these statements and did not elaborate on why an import/export business might engage in transactions involving over eleven thousand twenty-dollar bills. Further, Melissa denied knowing that Julio had not done as she asked until he told her, several months later, that the Currency had been seized.

¶9            Melissa testifeid she was in Texas when she asked Julio to make the deposit at the California bank and then travel to Phoenix to pick up money from a customer. When advised this was inconsistent with her deposition testimony that she deposited $24,500 at an ATM in California the day before Julio was arrested because she did not feel comfortable carrying all that cash, she claimed those deposits were actually made by her mother, from her mother's personal funds, while Melissa was out of town.

¶10           In his testimony, Julio abandoned both of his prior accounts and corroborated Melissa's story. Julio explained that even though he drove by Melissa's California bank on his way to Phoenix, he put off the deposit of her savings because "it would be easier just to . . . just do one big deposit at once." Julio testified that before he left California, he spent several hours removing, counting, and binding the cash from under Melissa's mattress, vacuum-sealing the bundles, and concealing them in the kitty litter and detergent boxes so "it wouldn't be detectable to anybody, a thief or a police officer," acknowledging "that if [he] were pulled over, [he] could get the money forfeit[ed]." He then testified he purchased the other bulk grocery items in California to hide the boxes with the Currency.

¶11           Julio then stated he picked up additional funds from Melissa's client in Phoenix, but there were no banks open when he left a motel early the next morning, so he packaged that money the same way, thinking he would deposit nearly a quarter of a million dollars in one of the little cities in Arizona he would drive through on the way to California. He did not explain how he was able to vacuum-seal the money in his motel room before heading back toward California.

¶12           After taking the matter under advisement, the trial court ordered the Currency forfeited to the State, finding: (1) the State proved by

a preponderance of the evidence that the Currency was subject to forfeiture pursuant to Arizona Revised Statutes (A.R.S.) sections 13-2301(D)(4)(b)(xi),[2] (xxvi), -2314(G)(3), and -4304; and (2) Melissa failed to prove by a preponderance of the evidence that any ownership interest she might have in the Currency was exempt from forfeiture pursuant to A.R.S. § 13-4304. Melissa timely appealed, and we have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1) and -2101(A)(1).

**DISCUSSION**

## I.    Motion *in Limine*

**¶13**        Melissa argues the trial court erred in denying her motion *in limine* to preclude evidence of the canine alert as a discovery sanction for the State's failure to timely disclose certain details regarding the training and certification of the canine.[3] *See Zimmerman v. Shakman*, 204 Ariz. 231, 235, ¶ 13 (App. 2003) (noting that a motion *in limine* to enforce disclosure rules "is effectively a request for sanctions under Rule 37(c)"). The trial court has broad discretion over discovery matters, and we will not disturb its rulings on those matters absent an abuse of that discretion and resulting prejudice. *Id.* at ¶ 10 (quoting *Brown v. U.S. Fid. & Guar. Co.*, 194 Ariz. 85, 88, ¶ 7 (App. 1998)); *see also State v. Towery*, 186 Ariz. 168, 186 (1996) ("Denial of a sanction is generally not an abuse of discretion if the trial court believes the defendant will not be prejudiced.") (citing *State v. Fisher*, 141 Ariz. 227, 246 (1984)). We find none.

**¶14**        Melissa asserts she was prejudiced because she was forced to "engage in discovery on the stand," and, had she received the information earlier, "an objective expert could have found significant flaws in the canine's pedigree, medical records, certifications, and overall performance." Melissa made these same assertions during oral argument; however, the record reflects the trial court deferred its ruling until the conclusion of the trial in order to carefully consider whether she had

---

[2]        Absent material changes from the relevant date, we cite a statute's current version.

[3]        Melissa does not dispute she was advised during discovery that the investigation included a canine sniff, the canine was trained to alert to the odor of certain illegal drugs, and the canine alerted to the kitty litter box. Nor does she dispute she was provided the name of the canine and the canine officer, a list of the canine's certifications, and a copy of the police report documenting the investigation.

suffered any prejudice from the purported failure to disclose. Then, the court specifically found:

> [The canine officer] was questioned about and testified extensively about the dog's training, habits, personality and performance and there was no showing of prejudice to the Defendant. In other words, an ability to ask questions and elicit that testimony by the lack of the actual papers themselves. Plus, [the canine officer] testified that the certifications for the dog do exist and he explained what those certifications represent by way of the dog's training and performance.

Thus, the court concluded any disclosure violation was harmless. This finding is supported by the record. The canine officer confirmed the canine had received certain certifications and explained what training and performance were required to earn those certifications. And, Melissa's counsel engaged in extensive cross-examination of the canine officer on all aspects of the dog's training and certifications and the circumstances surrounding the sniff.

¶15        Melissa nonetheless argues she was prejudiced by introduction of evidence regarding the canine alert because: (1) the evidence was "harmful to her claim" and "dispositive to the outcome," and (2) the evidence was not reliable because the canine officer's testimony was subjective. These are not legitimate objections to the admissibility of evidence based upon the perceived disclosure violation. *See Allstate Ins. v. O'Toole*, 182 Ariz. 284, 287 (1995) (holding the court should consider whether a party was prejudiced by interference with his "'reasonable opportunity to prepare for trial or settlement — nothing more, nothing less'") (quoting *Bryan v. Riddel*, 178 Ariz. 472, 476 n.5 (1994)). Evidence that is relevant and material will usually be adverse to the opponent, but it remains admissible unless its probative value is outweighed by other factors not argued by Melissa here. *See State v. Schurz*, 176 Ariz. 46, 52 (1993); Ariz. R. Evid. 401, 402, 403. Additionally, "the bias of a witness goes to the weight of the testimony but not to its admissibility." *Pima Cnty. Mental Health Matter No. MH 862-16-84*, 143 Ariz. 338, 340 (App. 1984). Melissa had the opportunity to test the credibility of the canine officer and, consistent with the trial court's express findings, admits she took advantage of that opportunity. Therefore, there was no improper prejudice in admission of the evidence. *See State v. Little*, 87 Ariz. 295, 301 (1960) ("Prejudice ensues from a denial of the opportunity to place the witness in

his proper setting and put the weight of his testimony and his credibility to a test.") (citations omitted).

¶16         Accordingly, we conclude, even assuming the State committed a disclosure violation, the trial court did not abuse its discretion in admitting evidence of the canine alert.

## II.    Property Subject to Forfeiture

¶17         Melissa also argues the trial court erred in concluding the Currency was subject to forfeiture.  In a civil *in rem* forfeiture action, "the state has the burden of establishing by a preponderance of the evidence that the property is subject to forfeiture under [A.R.S.] § 13-4304."[4]  A.R.S. § 13-4311(M).  Whether the State has met this burden presents a question of fact, and we will accept the trial court's factual findings unless they are clearly erroneous. *$26,980.00*, 199 Ariz. at 296, ¶ 15 (citations omitted).  A finding is clearly erroneous if "'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *State v. Burr*, 126 Ariz. 338, 339 (1980) (quoting *Palermo v. Warden*, 545 F.2d 286, 293 (2d. Cir. 1976)).  We find no mistake here.

¶18         The trial court found the Currency was subject to forfeiture because it was traceable to a racketeering offense involving prohibited drugs and money laundering.  *See* A.R.S. §§ 13-2301(D)(4)(b)(xi), (xxvi) (defining "racketeering" to include any act committed for financial gain and involving prohibited drugs and money laundering), -2314(G)(3) (authorizing *in rem* forfeiture proceeding against "all proceeds traceable to an offense included in the definition of racketeering . . . and all monies, negotiable instruments, securities and other property used or intended to be used in any manner or part to facilitate the commission of the offense"), -4304 ("All property, including all interests in such property, described in a statute providing for its forfeiture is subject to forfeiture.").  Although Melissa presented evidence she obtained the Currency through the international purchase and sale of medical equipment, the State presented other evidence to support the inference that the Currency constituted

---

[4]         Melissa argues the State failed to establish "sufficient probable cause" to forfeit the property.  But, this lesser standard of proof applies only where no person asserts an ownership interest in the seized property and the State seeks forfeiture under the processes outlined in A.R.S. § 13-4314(A).  *See In re $24,000.00 in U.S. Currency*, 217 Ariz. 199, 202, ¶ 8 (App. 2007).  In contrast, here, Melissa asserted a timely claim and the matter proceeded to a hearing governed by A.R.S. § 13-4311(D)-(M).

proceeds from the sale of illegal drugs. Julio was traveling southbound on a route commonly used to launder money into Mexico. He lied to the arresting officer and in his affidavit about his activities before the arrest, but ultimately admitted he had actively concealed the Currency in a manner designed to avoid detection by police. The officers testified the grouping and denominations of the bills, the packaging in vacuum-sealed bags, the use of kitty litter and detergent to mask odors, and Julio's lack of knowledge regarding the specific dollar amount of the Currency were all consistent with the movement of funds derived from illegal activities. And, the canine alerted to the presence of illegal drugs on one of the boxes containing the Currency.

¶19 Melissa argues the evidence the State offered to show a nexus between the Currency and criminal activity was "mere suspicion, supposition, or surmise." She analogizes this case to *United States v. U.S. Currency, $30,060.00*, where the Ninth Circuit Court of Appeals affirmed summary judgment in favor of the claimant, holding evidence of a canine alert to narcotics on a large sum of money, paired with the claimant's inconsistent statement, was not sufficient to establish the currency was drug-related in light of expert evidence that seventy-five percent of cash in the Los Angeles area, where the seizure occurred, was contaminated with the residue of cocaine or other controlled substances. 39 F.3d 1039, 1042 (9th Cir. 1994). Indeed, Rivera spends a great deal of time in her brief arguing the scent of illegal drugs is, alone, insufficient as a matter of law to prove criminal activity occurred. While this may be true, *cf. State v. Sisco*, 238 Ariz. 229, 238, ¶ 28 (App. 2015) (holding the scent of marijuana alone was insufficient evidence of criminal activity to supply probable cause for a search warrant in light of the passage of the Arizona Medical Marijuana Act), there is no indication the trial court based its decision solely upon the inference to be drawn from the canine alert.

¶20 Nor is there any indication, as Melissa suggests, that the trial court "only considered the totality of the State's circumstances here and clearly ignored all of [Melissa's] proffered circumstances." The State presented significant additional evidence that the Currency was derived from a racketeering activity, including: the elaborate concealment of the Currency; Julio's inconsistent explanations for why the Currency was in the car he was driving and why it was packaged as it was; the purported delay between the seizure of nearly $250,000 and Melissa's discovery that the money had been seized; Melissa's questionable explanation for how she came to possess the Currency; and Julio's presence on a highway in an area where drugs and money are frequently trafficked, traveling in the direction drug money typically moved. *See $30,060.00*, 39 F.3d at 1043-44 (noting a

claimant's lies, lack of employment, travel to or from an area known for drug activity, possession of a large sum of money, and concealment of funds are all probative to determining a nexus between drugs and money).

**¶21**　　　　Although largely circumstantial, the evidence presented by the State is evidence nonetheless. *See Castro v. Ballesteros-Suarez*, 222 Ariz. 48, 54, ¶ 21 (App. 2009) ("Circumstantial evidence has the same probative value as direct evidence."). The State need not offer an admission by the courier or those he works for that the money was being laundered, and contrary to Melissa's assertion otherwise, the State is likewise not required to rule out every possible explanation for the circumstances.[5] Moreover, "we do not view the factors in isolation but instead consider the totality of the circumstances," *$24,000.00*, 217 Ariz. at 207, ¶ 32,[6] and it is ultimately the duty of the fact finder — here, the trial court — to choose among reasonable, competing inferences to be drawn from the evidence. *Summers*, --- P.3d at *5, ¶ 19 (App. 2016); *see also Goff v. Guyton*, 86 Ariz. 349, 352 (1959) ("[I]f two inferences may be drawn [from the evidence] we must accept the one chosen by the trial court.") (citing *Stewart v. Schnepf*, 62 Ariz. 440, 444 (1945)). On this evidence, and viewing it in the light most favorable to upholding the trial court's order, the trial court could reasonably infer a nexus between the recognized method and manner of the handling and transportation of this large amount of currency and criminal activity. *See, e.g., In re $315,900.00*, 183 Ariz. 208, 213 (App. 1995) (finding sufficient nexus where hundreds of thousands of dollars in currency were found in proximity to only four ounces of marijuana); *$24,000.00*, 217 Ariz. at 205-208, ¶¶ 22-31 (affirming forfeiture of funds contained in a package "shipped from an alleged drug-demand location to a drug-source location;" currency had been soaked in rubbing alcohol, wrapped in a plastic bag, sealed with

---

[5]　　　Melissa also argues the trial court erred in finding in favor of the State because the State did not investigate or offer evidence regarding the particular drug that was present on the Currency, and therefore, the canine could have alerted to legal marijuana. We do not consider arguments not presented to the trial court, nor those argued for the first time in a reply brief. *Tucson Estates Prop. Owners Ass'n, Inc. v. McGovern*, 239 Ariz. 52, 57 n.5, ¶ 15 (App. 2016) (citing *Trantor v. Fredrikson*, 179 Ariz. 299, 300-01 (1994)); *Summers v. Gloor*, --- P.3d ---, *5 n.6, ¶ 20 (App. 2016) (citing *Dawson v. Withycombe*, 216 Ariz. 84, 111, ¶ 91 (App. 2007)).

[6]　　　We find no support in the record for Melissa's assertion that the court "relied significantly" on *In re $24,000.00*, or that consideration of the case, which Melissa admits represents "the current state of the law," would have been improper.

duct tape, and placed inside a box packed inside another box; the package label contained fictitious addresses for the sender and recipient, as well as a fictitious phone number for the sender; no person had claimed the currency; and a certified narcotics dog alerted to the package); *$215,300.00 U.S. Currency*, 882 F.2d 417, 419 (9th Cir. 1989) (concluding sufficient evidence established a link between drugs and money under an "aggregate" of the facts test where there was a positive canine alert, the money was carried on a flight to a known drug-source city, the money was concealed and strapped to the suspect's body, and the travel agency which issued the suspect's ticket was known to have issued tickets to other people from whom the police had previously seized narcotics-related currency). We find no abuse of discretion.

## III.   Exemption from Forfeiture

**¶22**      Finally, Melissa argues the trial court erred in finding she had failed to establish the Currency was exempt from forfeiture under either A.R.S. § 13-4304(3) or (4).  The claimant bears the burden of proving by a preponderance of the evidence that her interest in the property is exempt from forfeiture.  A.R.S. § 13-4311(M).  Whether Melissa met this burden presents a question of fact, which we review for an abuse of discretion.  *See $26,980.00*, 199 Ariz. at 296, ¶ 15.

**¶23**      To prevail under A.R.S. § 13-4304(3), Melissa was required to prove "the conduct giving rise to the forfeiture both: (a) [d]id not involve an amount of unlawful substance greater than the statutory threshold amount . . . [and] (b) [w]as not committed for financial gain."  No unlawful substance was found here, and subsection (a) is not at issue.  With regard to subsection (b), Melissa does not argue that the funds were not being transported for financial gain, but only that Julio was acting in furtherance of a legitimate for-profit business.  The statute makes no such distinction.  Moreover, as noted above, substantial evidence supports the trial court's finding that the Currency was traceable to a racketeering offense, which is by definition committed for financial gain, *see* A.R.S. § 13-2301(D)(4)(b), notwithstanding the existence of conflicting evidence,[7] *see Smith v. Ariz. Dep't of Transp.*, 146 Ariz. 430, 432 (App. 1985) (holding a decision must be

---

[7]      Melissa argues in her reply brief that once she provided an alternate explanation for the Currency, the burden shifted back to the State "to produce additional evidence tipping the scales back in its favor."  The cases she cites do not support this proposition, and no such burden-shifting is reflected within the applicable statutes.

upheld even if there is substantial evidence to support two inconsistent conclusions, and may be reversed only where there is *no* substantial evidence to support it) (citing *DeGroot v. Ariz. Racing Comm'n*, 141 Ariz. 331 (App. 1984), and *Webster v. State Bd. of Regents*, 123 Ariz. 363, 365-66 (App. 1979)). The record supports the court's rejection of Melissa's defense under A.R.S. § 13-4304(3).

¶24 Melissa also argues she proved the exemption set forth in A.R.S. § 13-4304(4), which states "[n]o owner's or interest holder's interest may be forfeited under this chapter if the owner or interest holder establishes" certain facts. A necessary prerequisite to application of A.R.S. § 13-4304(4) is that Melissa own or hold an interest in the Currency. Again, the State's evidence, although disputed, gives rise to the reasonable inference that the Currency was not Melissa's, or even Julio's, and that Julio was transporting the funds for an unknown third person. Therefore, A.R.S. § 13-4304(4) does not apply.

¶25 Accordingly, the trial court did not abuse its discretion in determining Melissa failed to prove by a preponderance of the evidence that the Currency was exempt from forfeiture.[8]

## CONCLUSION

¶26 The order of the trial court is affirmed.



Ruth A. Willingham · Clerk of the Court
FILED: ama

---

[8] Because we find no error in the trial court's order, we need not address Melissa's argument that the alleged error resulted in a violation of her constitutional rights.